**CARTHAGENA LOCAL SCHOOL DISTRICT OF THE ST. HENRY LOCAL SCHOOL DISTRICT, Contest of, In re.**

Common Pleas Court, Mercer County.

No. 15033. Decided December 30, 1958.

Max Harley, Greenville, for contestors.
Dean James, Pros. Atty., for contestees.

**OPINION**

By DULL, J.

This election contest was submitted to the court upon a stipulated set of facts which are as follows: "The parties herein, namely, the Contestors, by their Counsel, and the Board of Education of Mercer County, Ohio, and the Board of Elections of Mercer County, Ohio, designated Committee in opposition, do hereby stipulate the facts as follows, to-wit:

"1. That the Board of Elections of Mercer County, Ohio, made an investigation with respect to the election contested, and that as a result of such investigation they did make a finding of facts as set forth below.

"2. That the vote upon the issue contested by the Petition, as certified by the Board of Elections of Mercer County, Ohio, was as follows:

"In favor of the transfer proposed — 82
"Against the transfer proposed     — 73

"3. That the results of the election, upon said issue, were certified by the Board of Elections of Mercer County, Ohio, on the 10th day of November, 1958.

"4. That the issue contested is the proposed transfer of a portion of the Carthagena Local School District to the St. Henry Local School District, as set forth in the Petition of the Contestors. A copy of the ballot used in the election, upon such proposed transfer, is attached hereto and made a part hereof, as if fully set forth herein.

"5. That said issue was submitted to the electors of the Carthagena Local School District, under the provisions of §3311.22 R. C. That said Carthagena Local School District includes part of four voting precincts in Mercer County, Ohio, said four precincts being known as 'Marion West,' 'Butler East,' 'Franklin West' and 'Granville.'

"6. That the contest arose out of the election thereon conducted and held on November 4, 1958, and the procedure and balloting in issue under the Petition and the Answer was that had on said date in the precinct known as 'Marion West.'

"7. That the Board of Elections of Mercer County delivered a total of 201 ballots on said issue to the precinct officials at said 'Marion West' precinct, but that said precinct officials failed to deliver the ballot upon such issue to the first 106 electors who presented themselves to said precinct, and who were eligible to vote upon said issue.

"8. That, when the relevant ballots were tabulated according to what is known as the 'poll book tally sheet method,' the following facts were developed:

"(a) That a total of 175 persons, who were eligible to vote upon such issue, presented themselves to the said 'Marion West' precinct at said election.

"(b) That there were a total of 81 of the ballots of such issue deposited in the ballot box in said precinct.

"(c) That under tabulation, in accordance with said poll book tally sheet method, 94 electors qualified to vote upon said issue at such precinct either were not issued ballots by the precinct officials or were issued ballots on said issue which said ballots were not returned to the ballot box. However, of such total of 94, the number who received ballots but whose ballots were not deposited in the ballot box. However, of such total of 94, the number who received ballots but whose ballots were not deposited in the ballot box, could not, in any event, total more than four.

"9. That, in tabulating the relevant ballots on such issue, in accordance with what is known as the 'ballot accounting method,' the following facts are shown:

"(a) That 106 persons who were eligible to vote on such issue presented themselves to such precinct prior to the discovery by the precinct officials that the ballots on this issue were not being passed out to the qualified electors.

"(b) That, of such 106 qualified electors who had not previously been issued the ballot on such issue, 16 re-presented themselves to the precinct officials, after having been notified that the ballot on such issue had not been given to them at their first appearance at the polls and that said 16 were thereupon issued ballots on such issue.

"(c) That, based upon the figures as shown in sub-paragraphs (a) and (b) above 90 qualified electors, upon such issue, at such precinct, were never issued ballots upon the issue in question.

"10. That, in arriving at computations to determine the number of qualified electors upon the issue who did not receive a ballot on the issue, different results are obtained and that the cause of the discrepancy between the two methods cannot be factually determined.

"11. That, upon discovery by the precinct officials that the ballots upon this issue were not being distributed to qualified electors on this issue, the following persons were notified: Mr. and Mrs. John Wenning, Ben Wenning, Anna Hartke and Mr. and Mrs. John Kunkler. Notification was made by a person designated for such purpose by the Board of Election. The above persons, in so far as was known, were the only persons who did not reside at St. Charles Seminary, who were notified to vote upon the issue and who had not received a ballot on the issue at the time of discovery of the failure to distribute.

"That Mr. and Mrs. John Wenning, Ben Wenning and Anna Hartke returned to the polls and were issued ballots on this issue. Mr. and Mrs. John Kunkler did not return to the polls and, therefore, were not issued ballots on this issue.

"12. That the Rector of St. Charles Seminary was notified of the failure to issue the ballots in question. Said Rector then notified persons residing in such Seminary who had presented themselves to the polls and were qualified, but who had not been given a ballot on said issue. In notifying said residents of such Seminary said Rector did not notify at least 20 qualified electors. One of the methods used in informing such qualified electors was by public address system in one of the two dining halls of such institution.

"13. That there was no re-count had upon such issue.

"The foregoing being within the knowledge of the undersigned, they herewith submit the same to the Court as stipulations of fact herein."

The pivotal question presented by this case to the court for an answer is this: Shall the Carthagena Local School District election of November 4, 1958, be invalidated because at least 90 eligible voters who presented themselves at the polls at one of the 4 precincts were not given proper ballots and none of whom returned to the polls to vote, although more than a majority of such 90 voters were notified, either directly or indirectly, in time for them to return?

The courts of the land have gone to extreme lengths to preserve the validity of all elections.

"Strictly speaking, all provisions of the election laws are mandatory in the sense that they impose the duty of obedience upon those who come within their purview, but irregularities which were not caused by fraud and which have not interfered with the full and fair expression of the voters' choice should not effect a disfranchisement of the voters. Errors innocently made and not in violation of the substantial rights of the electors are not grounds for invalidating an election. Honest mistakes or mere omissions on the part of the election officers, or irregularities in directory matters, even though gross, if not fraudulent, will not render an election, or particular votes cast therein, invalid, unless they affect the result of the election, or render it uncertain. Mere irregularities which do not go to the foundation of the election will not invalidate it, although the provisions of the statute have been technically violated, if it appears that there has been a fair election and a comparatively full vote, and no fraud or attempt to deceive or mislead." **Vol. 19, O. Jur. 2d, Elections, Sec. 138, pp. 143 and 144.**

"Acting pursuant to the power and duty conferred upon them to provide instrumentalities by which elections are to be accomplished, the legislatures of the various states have established elaborate and rigid rules and regulations for the conduct of elections. Before an election, such provisions are generally regarded as mandatory and their observance may be insisted upon and enforced, but after an election, they are regarded in a somewhat different light, and the general rule in such case is that a departure from the mode of holding an election as prescribed by statute, which does not deprive legal voters of their right to vote or permit illegal voters to participate in the election or cast uncertainty on the result, does not affect the validity of the election, unless the statute expressly declares that the particular act is essential to the validity of an election or that its omission shall render the election void or unless there is a violation of a constitutional requirement." Vol. 18, Am. Juris., Elections, Sec. 206, pp. 319 and 320.

"Voters who have done all in their power to case their ballots honestly and intelligently are not to be disfranchised because of an irregularity, mistake, error, or even wrongful act, of the officers charged with the duty of conducting the election, which does not prevent a fair election and in some way affect the result. Elections should never be held void unless they are clearly illegal; it is the duty of the court to sustain an election authorized by law if it has been so conducted as to give a free and fair expression of the popular will, and the actual result thereof is clearly ascertained. It has even been held that gross irregularities not amounting to fraud may not vitiate an election." Vol. 29, Corpus Juris. 2d, Elections, Sec. 214, p. 309.

The authorities have attempted to draw a distinction between the directory and mandatory provisions of the election laws. If, in general, the provision of the election laws violated was a directory provision, then the election has been allowed to stand. If, again in general, the provision of the election laws violated was a mandatory provision, then the election has been invalidated.

But when is a provision of the election law merely directory? When

does it become mandatory? As Shakespeare in HAMLET put it so well: "—ay, there's the rub."

"No universal rule can be fixed to distinguish between directory and mandatory provisions of statutes, and whether an enactment is one or the other depends upon legislative intention, to be ascertained from nature and object of the act and consequences which would result from any given construction." Carr v. Board of Education, Vol. 150, N. E. 2d, 583 (1958), Item 2 of the syllabus.

"Statutory provisions fixing the time for the opening and closing of the polls have been uniformly held to be directory merely, unless such provisions are declared to be essential by the statute itself, and, as a general rule, irregularities in the opening and closing of the polls will not invalidate the vote cast thereat, in the absence of a showing of fraud or the loss or denial of substantial rights occasioned thereby. Accordingly, an election will not be invalidated by reason of the fact that the election officers, instead of closing the polls at the time provided by statute, kept them open an extra half hour, where there was no fraud or collusion, and not enough illegal votes were cast after the time fixed by statute for closing to change the result of the election. It was also held, in an early case, that the vote cast at certain precincts would not be rendered invalid by reason of the polls having been temporarily closed during the noon hour, where it appeared that no fraud had been practiced and no substantial right violated." Vol. 19, O. Jur. (2), Elections, Sec. 116, pp. 118 and 119; Fry v. Booth, Vol. 19 Oh St 25; Re Chagrin Falls, Vol. 91 Oh St 308.

"It should be remembered, however, that all statutes tending to limit the citizen in the exercise of the right of suffrage are to be construed liberally in his favor, and that the courts are loath to disfranchise voters who are wholly innocent of wrongdoing. As a consequence, it is a firmly established general rule that votes will not be rejected, even though election officers fail to comply with the directory provisions of a statute, if there is no fraud or other irregularity and the failure to comply is unintentional; nor is it material in this connection that the failure of the election officers to perform their duty subjects them to penalties." Vol. 18, Am. Juris., Elections, Sec. 225, p. 331.

If, however, the irregularities in an election are tainted with fraud, illegality or are such as to render the results of the election uncertain, the general tendency is for the courts to declare such elections a nullity.

"But if the irregularities in an election are so great and so flagrant in character as to render it impossible to separate the illegal from the legal votes, and to raise a doubt as to how the election would have resulted had such irregularities not occurred, they must be deemed fatal to the validity of the election and to warrant the rejection of the entire vote of the election district." Vol. 19, O. Jur. 2d, Elections, Sec. 138, pp. 144 and 145.

"The failure of election officers to obey the mandatory provisions of a statute relating to the conduct of the election and designed to secure the secrecy and integrity of the ballot may so taint the votes with irregularity as to cause the rejection of the entire vote of the district." Vol. 18, Am. Jur., Elections, Sec. 225, p. 331.

"An election will be vitiated by irreguarities which are so numerous that they must be attributed to fraud rather than honest mistake; and although no actual fraud is apparent yet an election will be invalidated where the whole conduct of the election officers shows such gross negligence and disregard of their official duties as to leave the judicial mind in doubt as to how the election resulted, or would have resulted but for such wide spread irregularities. Vol. 29, Corpus Juris. 2d, Elections, Sec. 214, at p. 309.

"Mere inadvertence, mistake or ignorance in failing to observe each statutory requirement will not necessarily void either ballot or election so long as voter's intention may be clearly ascertained, no voter was disfranchised, fraud was not present and secrecy of ballot was not impaired; but if failure to comply with statutory provisions in particular case affected secrecy of ballot, disfranchised any voter, or resulted in perpetration of fraud, ballot or election must be pronounced void." Hester v. Kamykowski, Vol. 150, N. E. 2d 196 (1958), Item 8 of the syllabus.

"Where irregularities in an election are so great and so flagrant in character as to render it impossible to separate the illegal from the legal votes and raise a doubt as to how the election would have resulted had such irregularities not occurred, they must be deemed fatal to the validity of the election and warrant the rejection of the entire vote of the election district."

"Where, in an election contest, it appears that certain electors, in number several times greater than the plurality of votes awarded by the election authorities to the winning candidate over his opponent, were each delivered two identical ballots; that each such elector voted both ballots so delivered to him thus causing such ballots to be illegally cast: and that such illegal ballots were not subject to identification and rejection; such irregular and illegal voting is of such magnitude as to require the court to declare such election void and to set it aside." **Otworth v. Bays, Vol. 155 Oh St 366 (1951),** Items 1 and 2 of the syllabus.

In this case, too many ballots were passed out to the voters instead of too few being passed out as in the case under study. Nonetheless, the court declared such election void and set it aside.

"Where there is not even substantial compliance with §3505.11 R. C., which sets up a mandatory minimum requirement as to the number of ballots, the election will be held void."

"Secs. 3501.19 and 3501.21 R. C., providing for the number of polling places for voting, are clear and unequivocal, and their requirements are mandatory." **In re Election of Council of Oak Harbor, Vol. 57 O. O., p. 426 (1953),** Items 1 and 2 of the syllabus.

The facts in this case are quite similar to those in the case under study. The election officials failed to pass out enough ballots. At page 427 of the opinion the courts states: "Since this statute (§3505.11 R. C.), creates a mandatory minimum requirement, what is the effect of a violation of its terms? It is the opinion of this court that said violation voids the election for the office of council. Much stress has been placed on the fact that a trend was established in the election at 5:00 p. m. and that to set aside the election, the court must indulge the pre-

sumption that those voters refused a ballot, would have voted in such a way as to have changed the outcome. This court is of the opinion that in cases of this nature, courts should indulge in no presumption. The fact that one person was .refused a ballot, under the circumstances existing here, would be enough to put the election in doubt and to void that election. The knowledge that the ballots were exhausted, might keep many from even approaching the polls, and this court might with the same degree of relevancy indulge the further presumption that those who approached the polls during the period would be merely those who "didn't get the word." If courts decide contested election cases on such doubtful presumptions, it will have the effect of rendering our election laws directory only, and result in the eventual abolition of the traditional safeguards of voting. For a board of elections to fail to furnish the minimum ballots required by law, and subsequently have the ballots exhausted before closing time, would render the total vote in these precincts void irrespective of the number of people refused the right to vote. The election laws that pertain to the fundamental operation of voting, such as ballots and their make-up, should be rigidly enforced. Any relaxation of such enforcement will only invite fraud and corruption."

The creation of a county board of elections, its duties and authority are provided for by statute (§3501.06 R. C., et seq.).

Similarly, the selection of the precinct election officials, their duties and authority are provided for by statute (§3501.22 R. C., et seq.).

Sec. 3505.18 R. C., provides in part: "If voting machines are not being used in that precinct, the judge in charge of ballots shall then detach the next ballots to be issued to such elector from Stub B attached to each ballot, leaving Stub A attached to each ballot, hand the ballots to the elector, and call his name and the stub number on each of such ballots. The clerk shall enter such stub numbers opposite the signature of such elector in the poll book. The elector shall then retire to one of the voting compartments to mark his ballots."

Here the mandatory duty of the precinct election official is set forth in such a clear and succinct language that none should misunderstand. In case of some 90 eligible voters, the precinct election official of the "Marion West" precinct did not carry out this mandatory duty. For all practical purposes these 90 voters were disfranchised. They fall within the first classification as found in Vol. 12A at page 410 of Words and Phrases: "By 'disfranchised voters' is meant persons denied the right, by whatever means, to vote; persons permitted to vote, but whose votes, by reason of fraud, violence, or other wrong, have not been counted as cast."

The attempt of the precinct election officials to notify, either directly or indirectly, these disfranchised voters in order that they might return to the polls and cast their votes, while laudable, runs smack into the barbed wire of §3599.12 R. C. This statute provides in part: "No person shall vote or attempt to vote in any primary, special, or general election in a precinct in which he is not a legally qualified voter; or vote or attempt to vote more than once at the same election; - - - - - - Whoever violates this section shall be fined not less than fifty nor more than one

thousand dollars or imprisoned not less than one nor more than five years or both." As has been stated so frequently and at such length that its meaning may be lost; it's not only a right but a privilege to vote. But to vote more than once at the same election is a crime.

The primary and basic responsibility for a fair, honest and lawful election rests upon the county board of elections. This duty the members cannot shift or dodge. The board has the duty to instruct the precinct election officials as to the offices to be filled and the issues to be voted upon, the number and forms of the ballots and other details relevant to the conduct of the election. This duty the county board of elections either neglected or performed it in such a manner that no lasing impression was made—an occupational regret even among great pedagogues. Such negligence deserves censure.

But the practical responsibility—the responsibility directly to the voters—for the lawful conduct of an election falls on the precinct election officials. If no instructions or incomplete instructions were given by the county board of elections relative to the conduct of the election, it was their duty to make timely inquiry. This they failed to do. For which they deserve the sharpest censure.

The voters, too, cannot escape some censure. They should know what offices are to be filled and what issues are to be voted upon. If they didn't receive the proper ballots they should have asked for them. But, alas, an informed electorate is a political scientist dream. And criticizing the electorate has much the same practical effect as criticizing the dream itself. But we can dream, can't we? As Emerson in his essay on POLITICS so neatly phrased it: "But the wise know that foolish legislation is a rope of sand, which perishes in the twisting; that the State must follow, and not lead the character and progress of the citizen; the strongest usurper is quickly got rid of; and they only who build on Ideas, build for eternity; and that the form of government which prevails is the expression of what cultivation exists in the population which permits it. The law is only a memorandum."

It is, therefore, the finding of the court that the precinct election officials by their failure to pass out the proper ballots to some 90 eligible voters in the precinct known as "Marion West" failed in the performance of a mandatory duty. This failure was not cured by an attempt to notify either directly or indirectly such voters to return and cast their votes. The failure to perform such mandatory duty was such an irregularity as to cast the gravest doubt on what the results of the election would have been had all these 90 some eligible voters cast their votes. Not only does this figure 90 exceed the plurality of 9 votes by which the issue was decided, it exceeded the number of the votes in favor of the issue or the number of votes against the issue.

Hence, under the law of Ohio, it is the considered opinion of the court that the only order possible is: that the Carthagena Local School District election of November 4, 1958, be invalidated and set aside.

A journal entry may be prepared accordingly.