351 A.2d 101.

Louis D'Amico *et al. vs.* James Mullen *et al.*

FEBRUARY 9, 1976.

Present: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

JOSLIN, J. This civil action was commenced by taxpayers of the Town of Barrington against the defendants in their respective capacities as members of the Barrington Town Council and as Town Treasurer. The plaintiffs asked for a declaration that an election held in Barrington on November 6, 1973 was invalid and also sought an injunction against the defendants from taking any action to implement the announced result of that election. The case was heard in the Superior Court on an agreed statement of facts by a trial justice sitting without a jury and resulted in a judgment denying the relief sought and dismissing the action. The case is now here on the plaintiffs' appeal.

During its 1973 session, the General Assembly, at the Barrington Town Council's request, enacted legislation which, upon approval of the qualified electors of the town, would permit the construction of a town sewer system and authorize the necessary financing therefor, including a bond issue. Pursuant to further provisions of that enactment, the town council selected November 6, 1973 as the date for submitting the enabling legislation to the qualified electors of the town for their approval or rejection. That date was also the one on which the electors of the state were to vote on seven proposed amendments to the State Constitution.

In preparation for that election and under the authority of G. L. 1956 (1969 Reenactment) §17-11-1.1[1] the local

---

[1]General Laws 1956 (1969 Reenactment) §17-11-1.1 reads as folows:

"The board of canvassers of any city or town, for any special election to be held therein at which there will be submitted to the voters a question or questions for their approval or rejection but at which no state or local officials will be elected, shall have the power to combine two (2) or more voting districts within any

board of canvassers combined the town's ten regular voting districts into four districts, designated one polling place for each combined district and notified the State Board of Elections of this action and of the number of eligible voters. That board then furnished two voting machines for each combined voting district. The sewer project was approved by the narrow margin of 2458 to 2448. Since the election, almost $1½ million has been expended on the project, but actual construction has not yet commenced, and while no bonds have been issued, $5½ million in bond anticipation notes have been.

On July 25, 1975, nearly 2 years after the submission, plaintiffs commenced this action. They claim that the State Board of Elections failed to furnish the polling places with the number of voting machines mandated by §17-19-4[2] and/or §17-19-4.1,[3] and that as a result long

---

ward, senatorial or representative district, when in its judgment such combination is advisable, and when so combined shall be treated as a voting district."

[2]General Laws 1956 (1969 Reenactment) §17-19-4 reads as follows:
"For each voting district and for each town not divided into voting districts the state board shall furnish one or more voting machines as the situation and number of voters in such district or town may require. The machines furnished by the state board shall be equipped with ballot labels and adjusted for recording the votes of electors. At each voting place, both in cities and in towns, at least one machine shall be furnished for every five hundred (500) qualified electors, or fraction thereof, in excess of one hundred (100) whose names are upon the voting list used at such voting place and entitled to use such machines, as certified to the state board by the local boards on or before the tenth day of September, next preceding an election."

[3]General Laws 1956 (1969 Reenactment) §17-19-4.1 provides:
"Notwithstanding the provisions of §17-19-4 of the general laws, as amended, for each voting district and for each town not divided into voting districts the state board of elections shall furnish one or more voting machines as the situation and number of voters in such district or town may require in *all non-partisan primaries and elections;* provided, however, that in the case of primaries at least

lines formed at the polling places and a number of electors, who went to the polls two or three times, desiring to vote were unwilling to wait and departed without voting. The defendants' response is that compliance with these statutory provisions was not required, and that, even if it were, noncompliance did not invalidate the election. They also raise the equitable defense of laches.

The sum and substance of the trial justice's decision was that the questioned election was a special election, defined by §17-1-2(k) as "* * * any election other than a local election or primary election which is not held on a general election day"; that the nonpartisan election referred to in §17-19-4.1 is one wherein candidates without a party designation run for political office; that the special election held on November 6, 1973 was not a nonpartisan election and therefore §17-19-4.1, which applies only to nonpartisan elections and primaries, was not relevant; that underlying §17-11-1.1's authorization for the combination of voting districts at a special election was a legislative awareness of the typically low voter turnout to be anticipated at this kind of election and an intention to take advantage of the concomitant opportunity to reduce the expenses attendant thereon; that the legislative objective would have been frustrated had the board of elections been required to furnish each combined voting district with the number of voting machines stipulated by §17-19-4;[4] and that the Legislature had not otherwise

one (1) machine shall be furnished for every three hundred (300) qualified electors or fraction thereof in excess of one hundred (100) and in the case of elections at least one (1) machine shall be furnished for every two hundred fifty (250) qualified electors or fraction thereof in excess of one hundred (100)." (Emphasis added.)

[4]Two machines were provided for each of the four districts. Had the directive of §17-19-4 or §17-19-4.1 governed, the number of machines required would have been 21 or 40 respectively.

provided for the number of voting machines to be furnished at the election in question.

Having thus recognized that there was a gap in the statutory scheme, the trial justice proceeded to fill it by concluding (1) that the Legislature, had it been aware of the void, would have provided that the State Board of Elections should determine what number of voting machines would be reasonable and proper for a special election where districts had been combined; and (2) that the number furnished in this case met that standard.

We neither approve nor reject the trial justice's views, preferring in this instance to leave the responsibility of filling the open spaces in the law to the Legislature, which is now in session. This does not mean that we will always shy away from that task. Our opinion in *Town of North Kingstown* v. *North Kingstown Teachers Ass'n,* 110 R. I. 698, 705-06, 297 A.2d 342, 345-46 (1972), proves otherwise. What it does mean is that we are reluctant to engage in this kind of activity and will do so only where there is no adequate alternative basis upon which a case may be decided. There is such a basis in this case. We approach it assuming, but not deciding, that the number of machines furnished by the State Board of Elections on November 6, 1973 was inadequate, and on that assumption the issue becomes whether that inadequacy standing alone is sufficient reason for invalidating an election held almost 2 years prior to the institution of plaintiffs' challenge. We hold that it is not.

First, plaintiffs do not seriously contend that either they or any other electors were actually deprived of the right to vote. Clearly, they were discouraged by the long lines at the polling places, but nothing in the agreed statement of facts suggests that they would have been denied the right to exercise their franchise had they awaited their turn at the polls. The absence of that suggestion makes

*In re Election of Council of Village of Oak Harbor,* 57
Ohio Op. 426, 118 N.E.2d 692 (C.P. 1953),[5] and *In re
Carthagena Local School Dist.,* 7 Ohio Op.2d 470, 155
N.E.2d 267 (C.P. 1958), upon which plaintiffs rely prin-
cipally, clearly distinguishable. In one of those cases the
ballot supply was exhausted prior to the close of the polls,
and in the other the voters received improper ballots. In
both, therefore, the effect of the irregularities was to dis-
franchise; whereas in this case the irregularities, while
they may have resulted in inconveniencing prospective
voters and in dampening their desire to vote, in nowise
prevented a full and free exercise of their franchise. Absent
that effect, an irregularity is not invalidating. *See Arman-
trout* v. *Bohon,* 162 S.W.2d 867 (Mo. 1942); *Pellegrino*
v. *State Bd. of Elections,* 100 R. I. 71, 211 A.2d 655 (1965);
15 McQuillin, *Municipal Corporations* §40.14 at 276 (rev.
3d ed. 1970).

Moreover, we cannot lose sight of the principle that
courts should be reluctant to upset an election absent some
compelling reason to do so. *See, e.g., Orr* v. *Carpenter,*
222 Ark. 716, 262 S.W.2d 280 (1953); *Walters* v. *Common
School Dists.,* 265 Minn. 284, 121 N.W.2d 605 (1963);
*Mehling* v. *Moorehead,* 133 Ohio St. 395, 14 N.E.2d 15
(1938). The standards for determining what will be com-
pelling are set out in *Hoxsie* v. *Edwards,* 24 R. I. 338, 53
A. 128 (1902). While that case was decided many years
ago and leans heavily on the early text of McCrary on
Elections, the guidelines it adopts from that text still
prevail, and they prescribe that:

> " 'If the statute expressly declares any particular
> act to be essential to the validity of the election, or
> that its omission shall render the election void, all
> courts whose duty it is to enforce such statute, must
> so hold, whether the particular act in question goes

---

[5]The differences between the official and regional reports of this case
are without significance insofar as our decision is concerned.

to the merits, or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy, must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time, or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election. Those provisions which affect the time and place of the election, and the legal qualifications of the electors are generally of the substance of the election, while those touching the recording and return of the legal vote received, and the mode and manner of conducting the mere details of the election, are directory. *People* v. *Schermerhorn,* 19 Barb. 540. The principle is that irregularities which do not tend to affect the results are not to defeat the will of the majority; the will of the majority is to be respected even when irregularly expressed.' " *Hoxsie* v. *Edwards, supra* at 345-46, 53 A. at 130.

A further statement of the general controlling principles is found in *Bryer* v. *Sevigney,* 42 R. I. 187, 106 A. 155 (1919), where this court, quoting from an Indiana case, said that an election law provision not challenged until *after* an election[6] " '* * * should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or

[6]Objections to the validity of nomination papers that should have been made prior to, but were not made until subsequent to, the election were deemed insufficient for invalidation in *Sisson ex rel. Flynn* v. *Lisle,* 48 R. I. 281, 137 A. 466 (1927). In *Dupre* v. *St. Jacques,* 51 R. I. 190, 153 A. 240 (1931), the court distinguished *Sisson* and held that individuals who prior to the election sought by every reasonable means to object to the validity of the nomination procedures being followed were not foreclosed from subsequently attacking the validity of the election.

unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.' " *Id.* at 192, 106 A. at 157. To the same effect see the discussion in *Pellegrino* v. *State Bd. of Elections, supra* at 75-77, 211 A.2d at 658-59.

When we measure the asserted irregularities in this election against these standards, we find not only that the assertion that election laws had not been observed was unduly delayed but also that no voter had been disfranchised. Furthermore, nothing in the agreed statement of facts indicates how those who left the line because they were unwilling to wait would have voted nor suggests that their votes would not have accrued equally to proponents and opponents of the sewer project. Neither does it contain anything which would give us reason to believe that the outcome of the election was thereby affected. It seems to us, therefore, that in the circumstances the provisions in question must be deemed directory, and that the election results should not be vitiated.

The plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed and the case is remanded to the Superior Court for further proceedings.

Mr. Chief Justice Roberts did not participate.

*Moore, Virgadamo, Boyle & Lynch, Joseph R. Palumbo, Jr., Peter B. Frank,* for plaintiffs.

*Michael P. DeFanti,* Town Solicitor, for defendants.