378 A.2d 1061.

THOMAS A. McCORMICK *vs.* RHODE ISLAND STATE BOARD
OF ELECTIONS *et al.*

OCTOBER 20, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J.   Thomas A. McCormick was a candidate in the primary election held in the city of Providence on March 29, 1977 for the selection of the Democratic Party's candidate for the office of councilman for the city's Tenth Ward. At the close of the polls on that day, the voting machine count showed McCormick leading all other candidates and ahead of his closest competitor, Lloyd Griffin, by 90 votes. That lead, however, disappeared when, over McCormick's objections, the State Board of Elections validated, and the Board of Canvassers of the City of Providence counted, 123 ballots cast by absentee and shut-in voters. Griffin received 111 of those votes, McCormick 6, and the other candidates 6; thus, the official count showed Griffin leading McCormick by 15 votes.[1] Thereupon, McCormick initiated certiorari proceedings in this court challenging the right of electors to vote by absentee or shut-in ballot at a primary election. We ordered the writ to issue. *McCormick* v. *Rhode Island State Bd. of Elections*, 118 R.I. 922, 374 A.2d 113 (1977).

Oral argument in the case was heard in this court on April 22, 1977. On April 27, 1977, we issued an order, Justice Doris dissenting, quashing the Board of Canvassers' certification of Griffin as the Democratic candidate for councilman on the ground that "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." *McCormick* v. *Rhode Island State Bd. of Elections*, 118 R.I. 926, 374 A.2d 114 (1977.)

---

[1] The results of the primary election of March 29, 1977 were as follows:

|  | MACHINE | ABSENTEE | SHUT-IN | TOTAL |
|---|---|---|---|---|
| Clement | 165 | 0 | 2 | 167 |
| Fayerweather | 86 | 1 | 3 | 90 |
| Griffin | 377 | 34 | 77 | 488 |
| McCormick | 467 | 1 | 5 | 473 |
| Slater | 138 | 0 | 0 | 138 |

Thereupon, Griffin, in a motion labeled "Motion to Reargue," applied for leave to argue that the election for Tenth Ward councilman scheduled to be held on May 3, 1977 should be postponed and a new primary held to determine the nominee of the Democratic Party for that office. That issue had not been raised when the case was argued on April 22, 1977 and therefore did not qualify as a basis for a motion for reargument. *Wholey* v. *Columbian Nat'l Life Ins. Co.*, 69 R.I. 254, 273, 33 A.2d 192, 192 (1943). Nevertheless, the issues were grave and the public interest was involved; consequently, we agreed to hear argument on "the limited question of whether the Democratic primary already held shall be voided and a new Democratic primary held." *McCormick* v. *Rhode Island State Bd. of Elections*, 118 R.I. 929, 374 A.2d 116 (1977). Following that hearing,[2] an order was entered, Justices Paolino and Doris dissenting, denying Griffin's motion. *McCormick* v. *Rhode Island State Bd. of Elections*, 118 R.I. 930, 374 A.2d 116 (1977).

The initial question is, of course, whether absentees and shut-ins may vote at primary elections. It is not seriously contended that they have a constitutional right to do so[3] and our concern is therefore limited to whether the Legislature has authorized them to do so. The governing statute, G.L. 1956 (1969 Reenactment) §17-20-1, enumerates with specificity the elections at which shut-in and absentee

---

[2]When the case was called for argument, a member of the bar addressed the court and orally moved for leave to intervene to present oral argument as an amicus curiae on behalf of those whose votes had been invalidated. For obvious reasons, the motion was denied.

[3]In *Fidell* v. *Board of Elections*, 343 F. Supp. 913, 916 (E.D.N.Y.), *aff'd mem.*, 409 U.S. 972, 93 S. Ct. 310, 34 L. Ed. 2d 236 (1972), a three-judge court said:

"Since providing for absentee balloting in primaries would be impractical and would require an inordinate amount of time, effort and expense, New York's failure to provide for such ballots must be held to be reasonably related to valid governmental interests and not to constitute a violation of plaintiffs' constitutional rights."

voting is permitted.[4] That listing of elections, however, notwithstanding its comprehensiveness, simply does not include primary election. The only reasonable inference to which that omission is susceptible is that the legislation does not provide for absentee and shut-in voting at party primaries. Since the statute is clear and unambiguous and expresses a definite and sensible meaning, there is no room for construction, and we do not read between the lines in an attempt to find a hidden signification; rather, we apply the statute in accordance with its plain meaning. *See; e.g., Pucci* v. *Algiere,* 106 R.I. 411, 421, 261 A.2d 1, 7 (1970); *Bowen* v. *Simmons,* 97 R.I. 283, 285, 197 A.2d 275, 277 (1964); *Brown & Sharpe Mfg. Co.* v. *Dean,* 89 R.I. 108, 116-17, 151 A.2d 354, 358 (1959); *Vezina* v. *Bodreau,* 86 R.I. 87, 91, 133 A.2d 753, 755 (1957).

But even were we to consider §17-20-1 ambiguous, as Griffin urges, we would still construe it the same way because its legislative history compels that construction. That history commences with *Roberts* v. *Board of Elections,* 85 R.I. 203, 129 A.2d 330 (1957), in which the governorship of this state turned on the court's invalidation of several thousand civilian absentee and shut-in ballots that had been cast on a day other than that fixed by the constitution as election

---

[4]General Laws 1956 (1969 Reenactment) §17-20-1 provides that qualified electors who are absent from the state or who, by reason of old age, physical disability, illness, or other physical infirmity, are unable to vote in person shall have the right to vote in all elections in the state for

(1) president and vice president of the United States;
(2) United States senators and congressmen;
(3) general officers of the state;
(4) senators and representatives in the General Assembly;
(5) any other officers whose names appear on the state ballot;
(6) city, town, ward and district officers; and
(7) propositions of amendment to the constitution and propositions appearing on the state, city, or town ballot.

day.[5] In response to the public demand for clarification of our election laws that followed on the heels of that decision, the Legislature, in Resolution H. 1036, Substitute A (as amended), Jan. Sess. (1957), directed the appointment of a commission[6] and charged it with the power and duty of "studying, revising and codifying all of the election laws of the state of Rhode Island." In the discharge of that responsibility, the members of the commission pooled their collective years of experience and their special knowledge of this state's election practices; sought the aid and advice of the State Board of Elections, of every board of canvassers in the state and of a number of individuals with special knowledge of election administration; and had the benefit of the objective judgment and advice of the commission's consultant,

---

[5]Justice Doris misreads our opinion when he asserts in his dissent that we rest our argument on *Roberts* v. *Board of Elections*, 85 R.I. 203, 129 A.2d 330 (1957). So, too, does he misread *Roberts* when, comparing it with this case, he suggests that while a new election was inappropriate in *Roberts* because of the voters' failure to "follow proper procedures," a new primary should be held here because the voters "in good faith fulfilled all the requirements which were clearly directed by state election officials." That comparison is just not apt for in the *Roberts* case 4,954 electors whose votes were there invalidated because cast prior to election day, no less than the electors in this case, voted in good faith reliance upon instructions of a responsible state official. That official was the secretary of state whose instructions to the voters were issued pursuant to P.L. 1953, ch. 3204, which specifically authorized absentees and shut-ins to vote on or before election day.

[6]The chairman of the commission was Jeremiah E. O'Connell, a retired associate justice of this court, who prior to sitting on this court had served as presiding justice of the Superior Court and as a representative of this state in the Congress of the United States. The other members of the commission were the then majority (Honorable James H. Kiernan) and minority (Honorable Joseph E. Mally) leaders of the Rhode Island House of Representatives; the then majority leader (Honorable John McWeeney) and a senior member (Honorable Harry Hall) of the Rhode Island Senate; a former president of the Rhode Island League of Women Voters (Nina L. Hedges); chief counsel for Dennis J. Roberts (John G. Coffey, Esq.) and Christopher Del Sesto (Alfred H. Joslin, Esq.), the real parties in interest in *Roberts* v. *Board of Elections*, 85 R.I. 203, 129 A.2d 330 (1957); and two members of the Rhode Island Bar (Edward M. Dolbashian, Esq. and Edward J. Hindle, Esq.). Senator McWeeney and Representative Kiernan were not signatories to the report of the commission referred to in the text, *infra*, and they filed a minority report. Nothing in their report, however, took issue with either the majority report or the draft legislation with respect to the question of the right to vote in absentia at party primaries.

Dr. William Miller, Professor of Law at New York University and a nationally recognized expert on election laws and practices. *Report of the Election Laws Study Commission* iv (1957).

On November 15, 1957, the commission submitted to the governor and the General Assembly a report of its deliberations, findings and recommendations. Chapter 6 of that report, entitled "Voters-Absentee, War and Shut-in," states:

> "Under present law (Section 17-20-1) the provisions for absentee and shut-in ballots apply to all general, special, off year and municipal elections, including propositions appearing on the state, city or town ballot, but these provisions *do not* appear to cover school elections, *primary elections* or financial town meetings. * * * The Commission has found that the application of absentee voting to special elections, *party primary elections,* and special referenda elections on public propositions is ineffectual and leads to an excessive cost for the rare use that is made of it." *Id.* at 27 (emphasis added).

The report recommended that absentee, shut-in and war ballot voting be extended to general elections, elections to fill federal offices and regular municipal elections, but it did not recommend that such voting be allowed at primary elections. *Id.* These recommendations were embodied in draft legislation which the commission submitted to the Legislature and which was enacted into law in substantially the same form as submitted. Public Laws 1958, ch. 18, §1. Although that legislation made many changes in the election laws, §17-20-1, as then enacted and as it now reads, substantially tracks the prior legislation, which the commission in its report had said did not appear to permit absentees or shut-ins to vote at primary elections. Obviously, had the Legislature intended to permit voting in absentia at primary elections, it would have taken cognizance of the commis-

sion's conclusion that existing law did not appear to permit such voting, and it would have amended §17-20-1 so as to permit it. The Legislature's failure to act in this respect convinces us beyond question that it shared the commission's view that absentee and shut-in voting at primary elections was not permitted under existing law and should not be authorized by the newly enacted legislation.

Moreover, the view that the statute does not permit absentees and shut-ins to vote at primary elections was not the commission's alone. It apparantly was shared by successive secretaries of state who from 1932, when absentee and shut-in voting was first authorized, until quite recently, made no provisions for absentee and shut-in voting at primaries. True, the practice was changed a few years ago, but the change occurred when the then secretary of state, without the support of an amendment to the statute, a judicial decision, or an opinion from the attorney general, decided sua sponte and without any announced rationale therefor that the time had arrived when electors should be allowed to cast absentee and shut-in ballots at party primaries. That sua sponte decision, when considered in light of the longstanding administrative practice that preceded it, carrries no weight on the question of legislative intent.

We consider now the "Motion for Reargument." By that motion Griffin, who until then had been on the defensive, arguing only in opposition to McCormick's contention that voting in absentia was not permitted at primaries, took the offensive. He argued that the voiding of the absentee and shut-in ballots necessitated the postponement of the election scheduled for May 3, 1977 and the holding of a new primary so that those who he claimed had been "disenfranchised" and "denied their voice in government" by our April 27 order might be allowed to vote at the polls.

Although Griffin's standing to urge the "disenfranchisement" of others as a basis for relief in his own favor is cer-

tainly open to question,[7] we do not focus on that issue. Instead, our concern is whether there is a reasonable probability that, but for the assurances that they could vote in absentia, those whose absentee and shut-in ballots were invalidated would have voted at the polls in sufficient numbers to enable Griffin to overcome McCormick's machine-count lead of 90 votes. *See* Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections,* 49 N.Y.U.L. Rev. 1092, 1124-26 (1974); *Developments in the Law — Elections,* 88 Harv. L. Rev. 1111, 1334-36 (1975); *cf. D'Amico v. Mullen,* 116 R.I. 14, 21, 351 A.2d 101, 105 (1976). To overcome that lead would have required that at least 91 of the 123 "disenfranchised" appear at the polls. Any lesser number could not possibly have affected the outcome.

The burden of proof on this issue rested upon Griffin, the party seeking to impeach the result of the earlier election. *In re De Martini v. Power,* 27 N.Y.2d 149, 151, 314 N.Y.S.2d 609, 610, 262 N.E.2d 857, 858 (1970). Yet he presented nothing to us, by way of affidavit or otherwise, to suggest that even a single one of the "disenfranchised" would have appeared at the polls on primary day to cast his vote. Nor is there anything in the records certified to us pursuant to our writ that would support that conclusion. We obviously cannot infer from a silent record that the requisite number of the "disenfranchised" would have voted at the polls had they known that they could not vote in absentia. Thus, in this case, unlike the case presented in the United States

---

[7]Following the entry of our orders in this case, Griffin brought suit in the United States District Court for the District of Rhode Island seeking substantially the same relief as that sought in his motion to reargue. *Griffin v. Burns,* Civ. No. 77-247 (D.R.I., filed Apr. 29, 1977). Joining Griffin as plaintiffs in that case were a qualified elector who voted by absentee ballot and one who voted by shut-in ballot in the March 29, 1977 primary. In addition, the court in that case certified as a class all who had voted by absentee or shut-in ballot at the March 29 Democratic primary. *Id.,* 431 F.Supp. at 1365, 1369 (1977). The court entered an injunction in favor of the class plaintiffs, but declined to grant any relief on Griffin's behalf and dismissed his claims. *Id.,* at 1363, 1369.

District Court for the District of Rhode Island, the burden of establishing that the outcome would have been different was not met.[8] We are therefore convinced that no sound basis was presented in this court for deferring the scheduled election and holding a new Democratic primary.

For the foregoing reasons, the petition for certiorari is granted; the certification of Lloyd Griffin as the Democratic Pary's candidate for councilman in the Tenth Ward is quashed; Lloyd Griffin's motion for reargument is denied; and, pursuant to our decision in this matter heretofore filed on April 27, 1977, the records certified to this court are ordered returned to the respondent board with our decision endorsed thereon.

Mr. Justice Doris, with whom Mr. Justice Paolino joins, dissenting. The initial question to be decided is whether or not absentee or shut-in ballots may be cast at party primaries. My reading of the governing statute in this case, G.L. 1956 (1969 Reenactment) §17-20-1, which provides for elections at which absentee and shut-in voting is permitted, leads me to the conclusion that voting by qualified absentee and shut-in electors is permitted in primary elections. Furthermore, the importance of this case appears to warrant the granting of the respondent Griffin's "Motion for Reargument" and the entry of an order ordering a new primary to allow those qualified electors whose votes have been invalidated by the majority opinion to cast their ballots at the polls for the candidate of their choice. For these

---

[8]At trial in the federal district court, four electors who had voted by shut-in or absentee ballot, including the two named plaintiffs, testified that they would have voted in person had they not received assurances from state officials that in absentia voting was permitted; one elector, produced by the defendants, testified that she would not have voted at the polls. *Griffin* v. *Burns*, 431 F. Supp. 1361 at 1363-64 (D.R.I., 1977). On the basis of that testimony, Judge Pettine assumed that the remaining 118 "disenfranchised" voters would have appeared at the polls, *id.* at 1365; then, with that assumption as his premise, he concluded that the outcome of the primary would have been different but for the assurances. *Id.* at 1368. With all due respect, it seems to us that the logic underlying the learned judge's assumption and conclusion is at least questionable.

reasons I respectfully dissent. The situations in which absentee and shut-in ballots may be cast are defined in G.L. 1956 (1969 Reenactment) §17-20-1. The statute allows absentee and shut-in electors, who are otherwise qualified, to vote in all elections for federal, state and municipal officials. It is conceded that the office for which respondent Griffin is a candidate is an office enumerated in §17-20-1. The question to be decided is whether §17-20-1 provides for absentee or shut-in voting in party primaries for such offices enumerated therein or provides for such voting only in elections. I believe that §17-20-1 should be read in conjunction with §17-1-2(a) which defines the term "election" for the purpose of Title 17 to mean the filling of any public office and shall include any state, town or city office and "any political party primary election for the nomination of any candidate for public office.'

As I read these statutes, therefore, they permit and authorize absentee and shut-in voting in primary elections for municipal officials. The absentee and shut-in ballots for all five candidates in the disputed primary ought to be tabulated, and based on that tabulation, respondent Griffin should be declared the party nominee for the office of councilman.

The majority finding of no ambiguity in §17-20-1 in regard to absentee and shut-in voting in primary elections fails to acknowledge the significance of §17-20-2(a) which specifically includes party primaries in the term "election." In reading §17-20-1 in conjunction with §17-1-2(a) the statute appears to me to be sensibly interpreted in more than one manner and is therefore ambiguous. Surely one cannot argue that it is not sensible to allow absentee and shut-in voting at party primaries to nominate candidates to be voted upon for public office. Because the meaning of §17-1-2(a) is clear, at least to me, it is presumed to be the one which the Legislature intended to convey. *Davis* v. *Lussier*, 86 R.I. 304, 308, 134 A.2d 124, 126 (1957).

The majority places great emphasis on the legislative history of §17-20-1 in concluding that absentee and shut-in

voting is not permitted in primary elections. They rely on the assumption that the Legislature subsequent to our opinion in *Roberts* v. *Board of Elections,* 85 R.I. 203, 129 A.2d 330 (1957), adhered to each recommendation and interpretation made by the O'Connell Commission so-called, which the Legislature did not specifically reject. I believe that the reliance on the report of the commssion is not well-placed,

The significance of the commission's final report does not seem to me to be entitled to the weight given to it by the majority. That report stated in relevant part that present election laws "do not appear to cover * * * party primary elections * * * ." The majority places great emphasis on the fact that the Legislature failed to amend this portion of the statute and therefore must have agreed with the analysis presented by the commission. There is, however, in my opinion, an equally plausible conclusion that the Legislature did not agree with the commission's view, which apparently was not based on legal precedent but rather on the commission's own reading of the statute and its knowledge of past practice, and consequently decided that amendment of the statute was not required in order to allow voting at party primaries by absentees and shut-ins. In any event, even assuming *arguendo* that the Legislature by its silence adopted the commission's view 20 years ago, it now appears that the Legislature by its silence reversed itself seven years ago and accepted the interpretation by the Secretary of State. Even if this assumption were as sound as the majority believes, the recent prompt action of the Legislature following this court's order on April 27, 1977, quashing the certification of Griffin as the Democratic candidate for councilman in enacting a statute expressly permitting absentee and shut-in voting in primary elections casts some doubt on the intent of the Legislature as presumed by the majority.

I note here that the Secretary of State has for the past several years made available absentee and shut-in ballots for

use in party primary elections without any attempt by the Legislature to prohibit this practice. The acquiescence of the Legislature in the interpretation of the statute by the Secretary of State seems to me to be some evidence of a legislative belief in the correctness of that interpretation. The compliance of the voters with the procedures set up by election officials for the past several years clearly entitles them to expect that their actions are lawful and that their votes cast in accordance with stated procedures will be counted for the candidate of their choice. The passage of time, approximately seven years, during which absentee and shut-in voting at party primaries was given official sanction, has given these voters the right to expect that they would be allowed to participate in party primaries and that such right should not be withdrawn lightly.

The decision in *Roberts* v. *Board of Elections*, 85 R.I. 203, 129 A.2d 330 (1957), upon which the majority builds its argument, involved the invalidation of ballots due to the voters' failure to follow proper procedures; here, the voters had in good faith fulfilled all the requirements which were clearly directed by state election officials. Under the circumstances, a denial to these voters to participate in the party primary in my opinion is closely akin to disenfranchisement.

Subsequent to this court's order in this case, Griffin sought to have the scheduled election deferred and a new primary scheduled in order to allow those absentee and shut-in voters whose votes had been disallowed by this court's order, to cast their vote for the candidate of their choice. This request has also been denied, forcing several such voters to file a petition in the United States District Court for the District of Rhode Island to obtain the relief sought here by Griffin. I am of the opinion that this court should have deferred the election and ordered the scheduling of a new party primary.

In considering Griffin's argument for reargument on the issue of holding a new primary, the majority focuses on

Griffin's failure to offer proof that those absentee or shut-in voters who were deprived of casting their ballots would have appeared in person at the polls in sufficient numbers to have given him a victory. However, such proof should not be the sole decisive element in a situation where disenfranchisement appears to have occurred. In *D'Amico* v. *Mullen*, 116 R.I. 14, 351 A.2d 101 (1976), which the majority cites in support of the necessity for the proof, there was no question of any actual denial of the voting privilege; it was rather a problem of too few voting machines at the polling places, which frustrated some voters in the exercise, but did not deprive them, of their franchise. While I agree that Griffin cannot complain of the deprivation of the voting right of others, yet, Griffin himself is being denied a right here, namely the fundamental principle in a democracy that the candidate receiving the plurality of the votes cast be declared the victor.

The refusal by the majority to either uphold the certification of Griffin or to grant his motion for reargument is to deny the absentee and shut-in voters their right to have their ballots given equal weight with other voters in the primary election.

In any event, the majority opinion dealt only with Griffin's failure to show the reasonable probability that except for the instructions that they could vote in absentia, those whose absentee and shut-in ballots were invalidated would have voted at the polls in sufficient number to enable Griffin to overcome McCormick's machine count lead. Voters who cast absentee and shut-in ballots in the primary on March 29, 1977, did so with ballots provided by state election officials in reliance on public pronouncements which assured voters that their votes would be counted in the same manner as the votes of those who were able to get to the polls. This had been established practice for the past several years, and was, in my view as stated earlier, mandated by law. The subsequent decision by this court nullifying the votes cast by these electors has deprived them of the funda-

mental right to which they are entitled as citizens, despite their reasonable belief that their votes were lawful.

In my view, the equities in this case require a new primary to allow these absentee and shut-in voters to cast their ballots at the polls. Without doubt many of those who cast absentee and shut-in ballots on March 29 could have reached the polls that day either by rearranging their affairs so that they would be in the state on primary day or by obtaining assistance to reach the polls. They did neither because the state election officials assured them that they could go about their busines on primary day and still be able to have their vote tabulated.

While I certainly agree that elections ought not be upset by the judiciary absent a compelling reason to do so, I feel this situation to be a most compelling one in which to call for a new primary. The ground rules by which all the participants, candidates and electors, operated in the March 29 primary were changed only after the fact. As a result, one hundred twenty-three electors, ten percent of all those who cast ballots in the primary, have been told that their votes will not count and the candidate holding a plurality of the votes cast at the close of the primary has been denied the nomination of his party. Because these events strike at the very premises by which elections are conducted in our democratic society, I can find no more compelling time to call for a new primary and restore in the people the knowledge that it is they who have the final word on who is to represent them in government.

For these reasons, I believe the court ought to have denied the petition for certiorari, or in the alternative, granted Griffin's motion for reargument, stayed the final election, and ordered a new primary to be scheduled.

*Temkin, Merolla & Zurier, Keven A. McKenna* (for Thomas A. McCormick).

*Cohen & Chaika, William Y. Chaika* (for Lloyd Griffin), *Stephen F. Achille* (for Board of Elections).