Lloyd T. GRIFFIN et al., Plaintiffs,
Appellees,

v.

Robert F. BURNS, etc., et al.,
Defendants, Appellees,

Thomas A. McCormick, Defendant,
Appellant.

No. 77–1250.

United States Court of Appeals,
First Circuit.

Argued Sept. 14, 1977.

Decided Jan. 19, 1978.

Thomas A. McCormick, pro se.

William Y. Chaika, Providence, R. I., with whom Cohen & Chaika, Providence, R. I., was on brief, for Lloyd T. Griffin, et al., appellees.

Julius C. Michaelson, Atty. Gen. and J. Peter Doherty, Sp. Asst. Atty. Gen., Providence, R. I., on brief, for Robert F. Burns, etc., appellee.

Ronald H. Glantz, Lincoln, R. I., with whom Joseph A. Rotella, Providence, R. I., was on brief, for Providence Board of Canvassers, appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, WOLLENBERG, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

This appeal, involving difficult issues of constitutional law and federalism, arises from a dispute over the use of absentee and shut-in ballots in a special Democratic primary election held in the Tenth Ward of Providence, Rhode Island, on March 29, 1977. The primary was held to select the Democratic candidate to run in a special election for a vacancy on the Providence City Council. Thomas McCormick, certified winner of the primary, appeals from the order of the Federal District Court for the District of Rhode Island directing that a new primary be held and postponing the general election. 431 F.Supp. 1361 (D.R.I. 1977). We affirm the district court's order and, as the new primary has already been held, lift our stay of the general election.[1]

### I.

We first set forth the facts. Vying for the position of Democratic candidate for City Council in the March, 1977, primary were appellant Thomas McCormick, nominal appellee Lloyd Griffin, Edward Clement, Lester Fayerweather, and Thomas Slater. Rhode Island regulates the conduct of party primaries in detail, R.I.Gen.Laws, 1956 (1969 reenact.), tit. 17, chs. 13, 14, 15, and the primary was managed pursuant to

---

* Of the Northern District of California, sitting by designation.

1. We understand that the incumbent has voluntarily continued to serve as Councilman pending the resolution of this suit.

statute by the Secretary of State of Rhode Island (the Secretary), the State Board of Elections (the State Board), and the Providence Board of Canvassers and Registration (the Board of Canvassers). R.I.Gen.Laws, tit. 17, chs. 6, 7, 8.

Rhode Island law, as it stood in March of 1977, expressly permitted absentee and shut-in voting in "all . . . elections in the state for . . . city, town, ward or district officers", but did not specify whether the "elections" in which absentee and shut-in ballots were allowed extended to the party primaries for such offices. R.I. Gen.Laws § 17–20–1. The Secretary and the other election officials, believing the issuance of such ballots in party primaries to be authorized, and acting in accordance with a practice that had existed in Rhode Island for about seven years in the case of primaries, advertised and issued various such ballots for use in this primary.[2] The applications for these ballots consisted of printed forms headed "State of Rhode Island and Providence Plantations", with a box entitled "For Use of Secretary of State Only" prominently appearing at the top. Procedures regularly followed in all Rhode Island elections of every type were employed in issuing and tabulating these ballots. See R.I.Gen.Laws, tit. 17, ch. 20. First, pursuant to R.I.Gen.Laws § 17–20–2, the Secretary advertised in newspapers that qualified electors could vote in the primary by casting absentee or shut-in ballots. Next, the Board of Canvassers processed and screened all applications for such ballots, forwarding the completed applications to the Secretary, who, after review and certification, sent the appropriate ballot to the absentee or shut-in, R.I.Gen.Laws § 17–20–4, –6, who marked and returned it to the State Board. The State Board, at open hearing, invalidated improper ballots and forwarded all valid ballots to the Board of Canvassers for opening and tabulation, R.I. Gen.Laws § 17–20–21. Finally, the Board of Canvassers calculated the final official vote and certified a winner, notifying the Secretary of its results.

In the instant primary, 131 votes were cast by absentee or shut-in ballots issued in accordance with this procedure. The State Board invalidated 5 of such ballots and the Board of Canvassers invalidated 3 more, leaving 123 to be combined with the machine-vote count. The final vote was as follows:

|  | Machine Total | Shut-in | Absentee | Total |
|---|---|---|---|---|
| Clement | 165 | 2 | 0 | 167 |
| Fayerweather | 86 | 3 | 1 | 90 |
| Griffin | 377 | 77 | 34 | 488 |
| McCormick | 467 | 5 | 1 | 473 |
| Slater | 138 | 0 | 0 | 138 |
|  | 1233 | 87 | 36 | 1356 |

Almost ten percent of the total vote recorded was cast by absentee or shut-in ballot. Though Thomas McCormick was the winner by 90 votes on the machine count, after tabulation of the absentee and shut-in ballots, Lloyd Griffin commanded a plurality of 15. Griffin was therefore certified the winner by the Board of Canvassers.[3]

After the primary, McCormick for the first time questioned the authority of the Secretary to issue and count absentee and shut-in ballots in a primary election. He made objection to those and other ballots before the State Board on March 31, 1977, arguing at hearings on March 31, April 1 and April 2 that no such ballots should have been certified by the State Board nor counted by the Board of Canvassers.

Failing to obtain relief in that forum, he promptly filed a petition for a common law

**2.** R.I.Gen.Laws § 17–1–2(a) defines the term "election" to include party primary elections. On the other hand, the absence of any specific reference to party primaries in the statutory provision for absentee and shut-in ballots could be read as precluding the use of such ballots in primaries. The Supreme Court of Rhode Island, with two dissents, adopted the latter view in litigation stemming from the primary at issue here. See infra.

**3.** The district court observed that the Tenth Ward contains a black population, living south of Route 95, which divides the Ward, and a white population which lives north of the Route 95 line. McCormick is white and Griffin black. The district court found "no evidence of any sort that the defendants had any intention to discriminate against Mr. Griffin . . . or any of his supporters . . . ." 431 F.Supp. at 1364. But see note 6, infra.

writ of certiorari in the Rhode Island Supreme Court. (This appears to be the accepted method in Rhode Island for a candidate to obtain administrative and judicial review of election results.) In the petition, McCormick named as defendants the State Board, the Board of Canvassers, the members of those boards, the Secretary, and McCormick's four opponents for the Democratic nomination. He contended that because the Secretary had no authority to issue and certify absentee and shut-in ballots in the primary, the 123 votes cast by such ballots were invalid.

On April 27, 1977, the Rhode Island Supreme Court granted McCormick's petition for certiorari, a majority of that court announcing briefly in its written order that "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." It ordered that the 123 such ballots be invalidated, and Griffin's certification as candidate be quashed. No opinion was filed with the April 27 order of the Rhode Island Supreme Court, but six months later the court issued a comprehensive written opinion. *McCormick v. State Board of Elections*, R.I., 378 A.2d 1061 (Oct. 20, 1977).[4]

Pursuant to the order of April 27, 1977, the Board of Canvassers revoked its certification of Griffin as candidate, and on April 28, 1977, officially named McCormick the Democratic nominee. Griffin then filed a "Motion to Reargue" before the Rhode Island Supreme Court, in which he requested to be heard on the question whether the court could or should nullify the March 29 primary and mandate a new election. Though stating that the question should have been presented at the original hearing

and did not qualify as a basis for a motion for reargument, the state court heard and on the same day, May 2, rejected the motion. During the hearing on the motion, a Rhode Island attorney, Walter Stone, requested and was denied permission to intervene as amicus curiae on behalf of those whose votes had been invalidated.

Four days later, on May 6, 1977, the Rhode Island General Assembly enacted a statute expressly authorizing absentee and shut-in voting in all future state primary elections. 1977 R.I.Pub.Laws ch. 153, "An Act Relating to Absentee Voting." The new law apparently took effect on May 12, 1977, the day it was signed by the Governor. The district court found that this enactment occurred after the April 27 decision of the Rhode Island Supreme Court had "caught the state by surprise."

On April 29, 1977, while the motion to reargue was pending, Griffin sought a federal remedy: he, with two other named plaintiffs, Mary Green, a shut-in voter, and Mary Morrow, an absentee voter, who had cast ballots in the primary, brought this action under 42 U.S.C. § 1983 seeking temporary relief from invalidation of their ballots. Relief was initially denied in deference to the Rhode Island Supreme Court's pending consideration of Griffin's motion for reargument. But after the state court denied Griffin's motion for argument on whether to hold a new primary, Griffin, Morrow and Green returned to the district court seeking a temporary restraining order which would postpone the general election, scheduled for May 3, until the district court could resolve their claim concerning the primary. On May 2, the district court issued a restraining order, holding that federally

---

**4.** The Rhode Island Supreme Court, with two of its five members dissenting, interpreted the absence of express reference to party primaries in the statute authorizing absentee and shut-in voting as a clear indication that such ballots were not legally authorized in primaries. *McCormick v. State Board of Elections*, R.I., 378 A.2d 1061 (1977). It also relied on the legislative history leading up to the 1958 statute, and pointed to the fact that until "a few years ago" (apparently seven), Secretaries of State had not issued such ballots in primaries.

The change of practice, the court said, "occurred when the then secretary of state, without the support of an amendment to the statute, a judicial decision, or an opinion from the attorney general, decided sua sponte and without any announced rationale therefor that the time had arrived when electors should be allowed to cast absentee and shut-in ballots at party primaries." *Id.* at 1064.

The two dissenting justices felt that the statute did authorize the use of absentee and shut-in ballots in party primaries.

cognizable rights were implicated by the facts presented. The court declined jurisdiction over Griffin on the ground that his claim, having been adjudicated by the Rhode Island Supreme Court, was now properly raised only before the United States Supreme Court, under 28 U.S.C. § 1257. It scheduled a hearing on the requested preliminary injunction for May 11, 1977.

At the May 11 hearing three voters from the Tenth Ward, including Mary Green, testified to having cast shut-in votes in the primary and insisted that they would have secured assistance to enable them to vote at the polls in person had they known their shut-in ballots would not be counted. Each described how he or she would have arranged to be transported to the polls. A fourth voter, Mary Morrow, who cast an absentee ballot, testified that she would have arranged her plans so that she could vote in the state, had she not relied on the representations of defendant officials that her absentee ballot was valid. McCormick produced one voter by shut-in ballot who declared that she could not have voted in person under any circumstances on election day because she was confined to the hospital.[5]

On the basis of this evidence, the district court certified a class under Fed.R.Civ.P. 23(b)(2) "of all those who voted by absentee or shut-in ballot in the March 29, 1977, Democratic primary in the 10th Ward in Providence," indicating in its opinion, issued May 17, 1977, that it felt constrained by Rule 23 and the "nature of the right to vote" to presume that, like Mary Green, Mary Morrow, and the other witnesses, all class members would have made arrangements to vote in person had they known this would be the only way their vote would count.

The district court went on to rule that while there is no federal constitutional right to an absentee or shut-in ballot in state primary elections, there is "an undoubted right, guaranteed by the Constitution, to vote in primary elections on an evenhanded basis together with other qualified voters." 431 F.Supp. at 1366. That right was found to have been denied when these qualified electors lost their franchise in the fashion described, after having voted in reliance on absentee and shut-in ballot procedures announced by state officials. The state's conduct was additionally characterized as in violation of the due process clause.[6]

The district court concluded that the equitable relief most appropriate in the situation at hand was to invalidate the March 29 primary, postpone the general election, and schedule a new primary and election in which the ground rules were clear. Preliminary to its order, the court found as a fact that the absentee and shut-in vote had affected the outcome of the election.

McCormick thereupon appealed to this court, filing with his notice of appeal a motion for stay of the district court's order. On July 5, 1977, we granted a stay of the newly-ordered general election, but denied a stay of the primary ordered by the district court. The second primary election was held as ordered by the district court on July 12, 1977. It was conducted in compliance

---

5. Appellee Griffin asserts that at the hearing, he was ready to produce approximately twenty-five additional voters, with "another twenty on immediate standby", who would offer similar testimony to that of Morrow and Green, but that because McCormick and the State of Rhode Island did not initially agree that morning to a hearing on the merits, Griffin's counsel excused many of the alleged twenty-five, asking only a representative few to stay and testify in support of the motion for a preliminary injunction.

6. While the court found no evidence of racial discrimination, *see* note 3, *supra*, it remarked

that, "many voters in the 10th ward perceive that an election won by their candidate, a black man, was suddenly reversed by a judicial decision holding a long-standing practice of counting absentee and shut-in ballots illegal. The voters of this same ward in November, 1976, elected a black state representative who has been refused his seat in the Rhode Island Legislature and extradited to Michigan. . . . [T]he actions complained of by plaintiffs had an undeniable racial effect on the outcome of the election, an effect observed by the black voters of the 10th ward." 431 F.Supp. at 1364 [Citation omitted.]

with the May, 1977, statute by which the Rhode Island legislature explicitly authorized the use of absentee and shut-in ballots in party primaries for local office.

We are advised that the significant results of the July 12 primary were the following:

|          | Machine Total | Shut-in and Absentee | Total |
|----------|---------------|----------------------|-------|
| Griffin  | 663           | 154                  | 817   |
| McCormick| 729           | 45                   | 774   |

The scheduling of the general election awaits our decision in the case.

In the present appeal, the Board of Canvassers of the City of Providence has filed a memorandum supporting the plaintiffs-appellees in which the Board states, "The retroactive effect of the order of the Rhode Island State Supreme Court leaving all those who chose to exercise their franchise in accordance with the seven-year custom or usage sanctioned by local and state officials, without any effective voice in choosing their representative, goes against the very foundations of the fabric of our democratic society." The Attorney General of Rhode Island, appearing for the Secretary, does not formally concede that quashing the ballots was improper but does not argue otherwise.

## II.

McCormick assigns numerous errors in the district court's disposition. He maintains that no constitutional deprivation sufficient even for assuming jurisdiction under § 1343(3) or § 1331 was shown by plaintiffs; that the suit is res judicata as to the voters; and that the group of voters in question was erroneously certified a Rule 23(b)(2) class. He further urges that the "outcome test" was not satisfied by plaintiffs, so that it was error to invalidate the revised results of the March 29 primary, and that principles of comity and federalism restrict the federal court's intervention in the matter. Finally, McCormick contends that the federal court is precluded from mandating a new primary because, under Rhode Island law, only the City Council of Providence and the Rhode Island Board of Elections, neither of whom are parties, can call a special election or fix the date for a primary.

1. *Preliminary questions.*

(a) Jurisdiction

■ Section 1343(3), the jurisdictional counterpart of 42 U.S.C. § 1983, provides that "district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation, under color of any State law, statute, . . . custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens. . . ." 28 U.S.C. § 1343(3). Jurisdiction thus turns on whether there is a substantial claim under § 1983. As we agree with the district court that the state's retroactive invalidation of the absentee and shut-in ballots in this primary violated the voters' rights under the fourteenth amendment, we hold that jurisdiction lies under § 1343(3).

(b) Res judicata

■ McCormick contends that this action is barred by principles of res judicata and collateral estoppel. There is no question that those principles are applicable in § 1983 actions that follow related state or federal civil litigation. *Lovely v. LaLiberte*, 498 F.2d 1261 (1st Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974); *Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973); see *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Developments in the Law—Section 1983*, 90 Harv.L.Rev. 1111, 1331–54 (1977). But in the present circumstances we do not think that the certiorari proceeding instituted by McCormick in the Rhode Island Supreme Court, nor the motion to reargue filed by candidate Griffin, bars the present § 1983 action brought by voters who were not parties to those earlier proceedings.

Res judicata precludes the parties to a law suit, and their privies, from relitigating issues that were or might have been raised

between them in that suit. One condition of res judicata is that the cause of action in the two suits be the same. *Sea-Land Services v. Gaudet*, 414 U.S. 573, 578–79, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). Another is that the persons who are barred from relitigation have been parties to the first suit or in privity with a party, and thus have had their day in court. Mere similarity of interest and a quantum of representation in the earlier suit does not suffice to bar a non-party. *See* 1B Moore's Federal Practice ¶ 0.411[1] (1965).

McCormick's petition for common law writ of certiorari, which named the other candidates and state election officials—but none of the voters—as defendants, focused primarily upon whether Rhode Island law authorized the issuance of absentee and shut-in ballots in primary, as contrasted with general, elections. After the court ruled that the ballots were invalid and should be quashed, the former winner, Griffin, moved unsuccessfully to reopen and, in urging his own position, argued that the court's order would also violate the rights of voters whose ballots were cancelled. The Rhode Island Supreme Court expressed doubt as to his standing to advance the voters' grievance as a basis for his own relief, and it flatly rejected attorney Stone's overtures to intervene as an amicus on behalf of the allegedly disenfranchised voters. Thus the state certiorari proceeding, to which the voters never became parties and which contained no provision for their representation, never progressed be-

yond an interpretation of the state election law and, to some degree, an adjudication of the rights of the candidates themselves. By contrast, the present § 1983 action, which does not question the state court's reading of Rhode Island election law, is concerned with the constitutional rights of voters who, relying upon official inducements and using ballots printed and furnished by the state, cast their votes in this primary only to have them nullified. There is not sufficient identity between the two proceedings for res judicata to constitute a bar.

Even more clearly, res judicata does not bar the present voter-plaintiffs as they were not parties in the state court proceedings, nor in privity with a party.[7] Privity is an elusive concept. It is most understandable when applied to recognized legal relationships: guardian (or guardian *ad litem*) and ward, trustee and beneficiary. It is said that the "'essential consideration is that it is the right of the [same person] which was presented and adjudicated by the courts.'" 1B Moore's Federal Practice, *supra* at 1253, *quoting Chicago R. I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 618, 46 S.Ct. 420, 70 L.Ed. 757 (1926). Candidate Griffin was the party to the state proceeding who comes closest to having been in privity with the absentee and shut-in voters.[8] His personal interests were bound up in having their votes counted, and he argued before the state court that the voters' rights were being unconstitutionally diluted. The Rhode Island Supreme Court did

**7.** There are specialized proceedings, such as bankruptcy, reorganization, or probate proceedings, where a party may be barred from future litigation by his mere failure to intervene. *See Penn-Central Merger and N & W Inclusion Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). Cases in that category would seem limited, however, to ones where by statute, rule or practice, intervention, after notice, is invited, or at least where the affected parties have reason to understand that their rights will be foreclosed unless timely asserted in the original proceeding. Nothing has been called to our attention placing the Rhode Island certiorari petition in this category. An election, like a bankruptcy, of course affects a multitude of interests, and might admit of similar treatment if the legislature were to establish

an appropriate format; but the common law certiorari proceeding as instituted by one of the candidates presented no clear opportunity and cut-off for resolution of the claims of the non-party voters. It does not appear that the present plaintiffs were required to be notified of the proceeding, and it is unclear if they would even have been allowed to intervene. The last-minute effort by Attorney Stone to intervene for some or all voters was disallowed.

**8.** The State Board, which was a party defendant to the certiorari petition, was not in privity with these voters: it is given no special interest in, nor duty to represent and protect before the court, those casting absentee and shut-in ballots.

not, however, deal with the constitutional issues that he raised, and questioned Griffin's standing to "urge the 'disenfranchisement' of others as a basis for relief in his own favor." *McCormick v. State Board of Elections, supra*, 378 A.2d at 1065. Candidates' rights, though related to voters' rights, are said to be distinct from them. *Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Clough v. Guzzi*, 416 F.Supp. 1057, 1066–67 (D.Mass. 1976) (3-judge court). A person's interest in participating in the political process through voting and having his vote counted is a right both "individual and personal in nature." *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963); *United States v. Bathgate*, 246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1917). The value of meaningful participation extends beyond that of the interest of the candidate of one's choice in a victorious election. As the Supreme Court said with respect to a congressional election, "The right to participate in the choice of representatives . . . includes . . . the right to cast a ballot and to have it counted at the general election, whether for the successful candidate or not." *United States v. Classic*, 313 U.S. 299, 318, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1940). While Griffin's personal interests were and presently are parallel with the voters', they are not necessarily identical— some voters voted for other candidates. We are unable to say that Griffin's candidate status, and his attempted assertion of the absentee and shut-in voters' claims, were enough to make him their actual personal representative whose action or non-action in the state proceeding would legally bind them. *See Dudley v. Meyers*, 422 F.2d 1389 (3d Cir. 1970).

The absence of privity also prevents collateral estoppel from applying here. Collateral estoppel forecloses relitigation of an issue that was expressly argued in a prior action even though the causes of action are not identical. One such issue could be the Rhode Island court's ruling that candidate Griffin had failed to prove that the outcome of the election would have been different had the Secretary not issued absentee and shut-in ballots. But as the plaintiffs were not in privity with Griffin, the state court's ruling cannot estop them from relitigating that issue. *See Cardillo v. Zyla*, 486 F.2d 473, 475 (1st Cir. 1973). Certain inroads have in recent times been made upon the rule of mutuality as it relates to collateral estoppel, *see, e. g., Blondertongue Laboratories, Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Cauefield v. Fid. & Cas. Co.*, 378 F.2d 876 (5th Cir.), *cert. denied*, 389 U.S. 1009, 88 S.Ct. 571, 19 L.Ed.2d 606 (1967), but these are not applicable to the present facts.

We hold, therefore, that neither res judicata nor collateral estoppel bars this action.

(c) Class certification.

McCormick challenges the district court's certification under Fed.R.Civ.P. 23(b)(2) of the class "of all those who voted by absentee or shut-in ballot in the March 29, 1977, Democratic primary in the 10th Ward in Providence." For the action to be so certified, it must satisfy the requirements of both subsections (a) and (b)(2) of Rule 23. Subsection (a) permits a class action "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Subsection (b)(2) requires that "the party opposing the class ha[ve] acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

With 123 voters as potential plaintiffs and only limited time to act,[9] the district court did not err in finding that joinder of

---

9. The election that plaintiffs sought to postpone was scheduled for May 3, only six days after the Rhode Island Supreme Court's ruling.

all class members would be impracticable. The court also properly discerned a question of law or fact common to the voters of the class, *i. e.*, whether the retroactive invalidation of ballots cast in an officially-endorsed manner amounted to a constitutional violation.

It is a closer question whether the named plaintiffs' claims were "typical", and whether those plaintiffs could fairly and adequately represent the class. Fed.R. Civ.P. 23(a)(3) and (a)(4). The named plaintiffs were all Griffin supporters, whose attorney had formerly represented Griffin. While these facts assured vigorous representation, *see Gonzalez v. Cassidy*, 474 F.2d 67, 72, 75 (5th Cir. 1973), a few—though only a few—of the absentee and shut-in voters had supported candidates other than Griffin and therefore might have preferred both to let stand the machine count of the March primary and to be represented by others than Griffin's supporters and counsel. But not all class members need "be aggrieved by or desire to challenge defendant's conduct in order for some to seek relief under (b)(2)." 7A Wright and Miller, Federal Practice and Procedure, Civil: § 1775 at 21 (1972); *Davis v. Weir*, 497 F.2d 139, 146–47 (5th Cir. 1974); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968); *see Senter v. General Motors Corp.*, 532 F.2d 511, 523–25 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). The vast majority of those who voted by absentee and shut-in ballot supported Griffin, and would presumably have favored a new election: 111 of the 123 such votes were cast for Griffin, and only six for McCormick, with the remaining votes being divided between candidates Clement and Fayerweather. And even persons who supported McCormick having suffered the loss of their ballots, shared with the other class members the legal injury complained of here.

McCormick further argues that Morrow's and Green's claims were not "typical", since not all of the class were shown to have been willing and able to vote in person had there been no absentee ballots. Not all, in other words, relied to their detriment upon the officially issued ballots.[10] The district court resolved this question by declining to presume that members of the plaintiff class "would have waived their fundamentally important right to vote for reasons of convenience", *citing Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Fuentes v. Shevin*, 407 U.S. 67, 94–96 & n. 31, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); and *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 307, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). Not only did plaintiffs produce the testimony of four witnesses that each would have voted in person, but the court also noted that two of these were "largely paralyzed", whose presence in court "testifie[d] to the importance class members place on the rights and duties of citizenship." Plaintiffs contend that they could have produced many other similar witnesses. McCormick, on the other hand, produced one witness who said she could not, because of hospitalization, have voted in person.

■ To proceed as a class, we do not think plaintiffs had to recreate the probable actions of every class member around the premise that only polling-place voting was authorized on March 29. The district court could infer, both from the evidence presented and from the nature of the right, that a substantial part of the class would have voted in person had absentee ballots not been offered. "Typicality" in this Rule 23(b)(2) action does not demand greater precision. *See Senter v. General Motors Corp., supra*, 532 F.2d at 525. Rule 23(b)(2) authorizes use of a class action where

> "the party opposing the class has acted . . . on grounds *generally applicable to the class*, thereby making appropriate final injunctive relief . . . with respect to the class *as a whole.*" [Emphasis supplied.]

---

10. McCormick frames this argument in terms of the absence of a common question of law or fact; we see it more as a question of typicality. Insofar as the same question relates to whether plaintiffs are entitled under the "outcome test" to a new primary, the question is discussed below under the issue of relief.

This action easily lends itself to that part of the rule: every member of the plaintiff class had his vote quashed simply because it was cast by absentee or shut-in ballot. "[T]he injunctive relief referred to [in the rule] does not require that the district court look into the particular circumstances of each member of the class." 3B Moore's Federal Practice, ¶ 23.40 at 23–653, –654 (1977). Actions under Rule 23(b)(2) may be more rough-hewn than those in which the court is asked to award damages: compare the notice and "opting-out" procedures prescribed for Rule 23(b)(3) actions, with the more flexible standards governing Rule 23(b)(2) suits. Fed.R.Civ.P. 23(c)(2), (3); 23(d).[11] Given the fundamental right in question and the relief being sought, plaintiffs' showing provided a sufficient basis for the district court's determination that the named plaintiffs' claims typified those of the class, and otherwise met the standards of Rule 23(b)(2). *See Yaffe v. Powers*, 454 F.2d 1362 (1st Cir. 1972); *see also Wetzel v. Liberty Mutual Life Insur.*, 508 F.2d 239 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

### 2. *The voters' constitutional claim.*

Appellees do not contend that Rhode Island was constitutionally required to provide for absentee or shut-in voting in party primaries, *see Fidell v. Board of Elections*, 343 F.Supp. 913 (E.D.N.Y.), *aff'd mem.*, 409 U.S. 972, 93 S.Ct. 310, 34 L.Ed.2d 236 (1972). Nor do they challenge the authority of the Rhode Island Supreme Court to construe the state's election laws so as to preclude such voting. Their claim is simply that Rhode Island could not, constitutionally, in-

validate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person. The state's action is said to amount—in result, if not in design—to a fraud upon the absent voters, effectively stripping them of their vote in the primary.

■ In analyzing this contention, we begin by agreeing with the court below that the plaintiffs' right to vote in this primary as in other elections is protected under the Constitution. In *Reynolds v. Sims, supra*, the Court held that unequally apportioned legislative districts were unconstitutional, and said,

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex parte Yarbrough*, 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274], and to have their votes counted, *United States v. Mosley*, 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355]. In *Mosley* the Court stated that it is 'as equally unquestionable that the right to have one's vote counted is as open to protection . . . as the right to put a ballot in a box.' 238 U.S., at 386 [35 S.Ct., at 905]. The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340], *Lane v. Wilson*,

11. Even in 23(b)(3) class actions alleging violations of § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, a cause of action in which problems of differing degrees of reliance by class members on alleged misrepresentations by defendants invariably occur, wide variance is permitted among class members. As the Ninth Circuit explained in *Blackie v. Barrack*, 524 F.2d 891, 910 (9th Cir. 1975),

"[Supreme Court case law] does not, however, as defendants seem to assume, dictate that any divergence of interest among class members violates due process (thereby necessarily requiring an identity of interests to

satisfy Rule 23's adequacy or [*sic*] representation and typicality requirements). Neither the Rule's requirements nor those of due process are so inflexible. The due process touchstone of adequacy and fairness of representation must be judged in light of the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented." [Citations and footnote omitted.]

307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281], nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315 [61 S.Ct. 1031, 1037, 85 L.Ed. 1368], nor diluted by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [25 L.Ed. 717], *United States v. Saylor*, 322 U.S. 385 [64 S.Ct. 1101, 88 L.Ed. 1341]. As the Court stated in *Classic*, 'Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . .' 313 U.S., at 315 [61 S.Ct., at 1037]. Racially based gerrymandering, *Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] and the conducting of white primaries, *Nixon v. Herndon*, 273 U.S. 536 [47 S.Ct. 446, 71 L.Ed. 759], *Nixon v. Condon*, 286 U.S. 73 [52 S.Ct. 484, 76 L.Ed. 984], *Smith v. Allwright*, 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987], *Terry v. Adams*, 345 U.S. 461 [73 S.Ct. 809, 97 L.Ed. 1152], both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible. And history has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." [Footnote omitted.] 377 U.S. at 554, 84 S.Ct. at 1377. In other cases it has been said that the right of suffrage is "a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 222 (1885). The Constitution "does not permit . . . the exclusion of otherwise qualified persons from

the franchise." *Phoenix v. Kolodziejski*, 399 U.S. 204, 209, 90 S.Ct. 1990, 1994, 26 L.Ed.2d 523 (1969) (improper to exclude non-property owners from voting on whether to approve a municipal bond issue). Primaries as well as general elections are protected as an integral part of the election process. *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1943); *United States v. Classic, supra*. Voting in local elections and referendums is subject to constitutional protection. *Phoenix v. Kolodziejski, supra; Kramer v. Union Free School Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

But while the language of these and other Supreme Court decisions leaves no room for doubt that plaintiffs' voting rights are, at bottom, federally protected, it is a closer question whether what happened here amounted to a constitutional violation entitled to a remedy in a federal court. Two arguments to the contrary can be made: (1) that not counting plaintiffs' votes is the sort of hardship that must be borne as the consequence of the state court's ruling on a disputed legal issue; and (2) that claimed election irregularities of this sort are beyond the ken of a federal court. We find no merit in either point.

With respect to the first argument, it is true that ballots may often be ruled invalid after an election due to innocent illegalities—a misplaced "X" or the like— but this is not that situation. Here neither McCormick nor any other candidate or voter had challenged the absentee or shut-in ballot procedures prior to the primary;[12] the issuance of such ballots followed longstanding practice; and in utilizing such ballots voters were doing no more than following the instructions of the officials charged with running the election. The statute on its face did not prohibit such ballots, and two of the members of the Rhode Island

---

12. The court in *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973), emphasized that voters' grievances concerning an election had, when possible, to be aired prior to the election. "[C]itizens having grievances may not lay by to see how the election will turn out before com-

plaining." *Id.* Here McCormick solicited absentee ballots and complained of the use of such ballots only after the results were in, when it was apparent that they benefited his opponent more than himself.

Supreme Court still believe the statute should be read to allow such ballots in a primary—a view which, of course, does not vitiate the majority's ruling, but does underscore the unreasonableness of expecting a voter to have questioned the State Secretary's and other state officials' issuance of the absentee ballots. Government officials who act ultra vires cannot, to be sure, create their own authority. But we do not see how an election conducted under these circumstances can be said to be fair. When a group of voters are handed ballots by election officials that, unsuspected by all, are invalid, state law may forbid counting the ballots, but the election itself becomes a flawed process. Given the closeness of the election here, and the fact that the "right of suffrage is a fundamental matter," *Reynolds v. Sims, supra,* 377 U.S. at 555, 84 S.Ct. at 1378, we are unwilling to reject appellees' claim merely on the fiction that the voters had a duty, at their peril, somehow to foresee the ruling of the Rhode Island Supreme Court invalidating their ballots. This is especially so where the interest of the state in the proper interpretation of its laws, and the interests of the voters, can both be accommodated by the relatively simple expedient of holding a new primary.

There remains the second and more difficult question of whether a federal court should intervene to invalidate a local election in this kind of situation. Federal courts have this power, acting under the Constitution as well as under the Voting Rights Act of 1965, 42 U.S.C. § 1973. *See, e. g., Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Bell v. Southwell,* 376 F.2d 659 (5th Cir. 1967). But even when dealing with overt racial discrimination, in violation of the fifteenth amendment, the Fifth Circuit termed the

power "[d]rastic, if not staggering . . . and therefore a form of relief to be guardedly exercised." *Bell v. Southwell, supra* at 662. *Compare Hubbard v. Ammerman,* 465 F.2d 1169 (5th Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973).[13]

Federal court intervention into the state's conduct of elections for reasons other than racial discrimination has tended, for the most part, to be limited to striking down state laws or rules of general application which improperly restrict or constrict the franchise, *see, e. g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 949, 31 L.Ed.2d 92 (1972) (rejecting candidate filing fees); *Harper v. Va. Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (rejecting poll taxes); *Reynolds v. Sims, supra* (rejecting geographical restrictions); *Phoenix v. Kolodziejski, supra* (rejecting limitation of franchise to property holders). The Supreme Court has, however, read the criminal counterpart to the civil rights statutes as conferring federal jurisdiction over corrupt practices in state-run elections for federal office. *United States v. Saylor,* 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); *United States v. Mosley,* 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

Circuit courts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities. In *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975), the Seventh Circuit refused to act in a case involving the malfunctioning of voting machines in an election for county office. It described the election errors as "at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent." *Id.* at 864. Judge Tone made clear the panel's belief "that the Constitution protects the right of all qualified

---

**13.** The Fifth Circuit described 28 U.S.C. § 1344 as "the only Act of Congress conferring jurisdiction on a United States District Court in a state or local election contest (primary or general) to hear and decide the issue of who has received a majority of the votes legally cast." *Hubbard v. Ammerman,* 465 F.2d 1169, 1180 (5th Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973). That statute

relates solely to racially-based denials of the right to vote. The Fifth Circuit's comment takes no account of any possible effect of § 1983 or other civil rights statutes. *Cf., e. g., United States v. Saylor,* 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944) (applying the criminal analogue of § 1985 to a case of election fraud).

citizens to vote in state and federal elections and to have their votes counted without debasement or dilution." *Id.* at 863–64 (Citations omitted.) But he went on to distinguish the voting machine problems in that case from "wilful conduct which undermines the organic processes by which candidates are elected." *Id.* at 864. Only the latter, in the court's view, would give rise to a constitutional claim and action under § 1983.

Judge Kaufman, writing for the Second Circuit, similarly denied relief to six voters who sought a federal remedy (under the Voting Rights Act of 1965 as well as § 1983) after a close congressional primary where, by mistake, a number of non-party members were allowed to vote. *Powell v. Power,* 436 F.2d 84 (2d Cir. 1970). The plaintiffs had sought too late the existing state remedy for review of claimed irregularities of this nature. In rejecting their subsequent § 1983 claim, the court said,

> "[T]he due process clause and article I, section 2 [of the Constitution] offer no guarantee against errors in the administration of an election. New York Election Law §§ 145, 330(2) provide a method for correcting such errors as are made, and the plaintiffs do not contest the fairness and adequacy of the remedy."

*Id.* at 88. Earlier in its decision, the court rejected plaintiffs' contention that the Voting Rights Act and § 1983 "comprehensively protect their ballots against dilution by illegal voting whether or not the dilution was wilful or knowing." *Id.* at 86.

Even where racial discrimination is alleged, the circuit courts have deferred to ongoing state recount and review procedures where these appear to be adequate and the alleged misconduct is lacking in "enormity". *Hubbard v. Ammerman, supra* at 1177, 1181; *Toney v. White,* 488 F.2d 310 (5th Cir. 1973). This is because the Constitution confers upon the states the "power to control the disposition of contests over elections to . . . state and local offices." *Hubbard v. Ammerman, supra* at 1176, *citing Roundebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972). The

federal court is not equipped nor empowered to supervise the administration of a local election. If every election irregularity or contested vote involved a federal violation, the court would "be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Powell v. Power, supra,* 436 F.2d at 86; *see also Pettengill v. Putnam County,* 472 F.2d 121 (8th Cir. 1973).

But while, as the foregoing authorities indicate, local election irregularities, including even claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures exist, there remain some cases where a federal role is appropriate. The right to vote remains, at bottom, a federally protected right. If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane. But there is precedent for federal relief where broadgauged unfairness permeates an election, even if derived from apparently neutral action. *Cf. Brinkerhoff-Faris Co. v. Hill,* 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). In *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill.1969), a federal district court invalidated an election for the Board of Village Trustees, clerk, and other matters, in Wilmette, Illinois, on due process and equal protection grounds. Two months before the scheduled town election, the incumbent trustees quietly proposed and passed an ordinance reducing the number of voting precincts from 32 to 6. When election day arrived, these precincts turned out to be entirely inadequate to the number of electors wishing to vote. Traffic jams ensued, people waited hours to reach the polls, some were forced to vote outside of voting

booths, people in populous precincts could not vote, and other problems arose. Though the precise number of voters turned away was incapable of calculation, the federal court invalidated the entire confused election, holding that due process and equal protection deprivations had been made out by the plaintiff class of "all registered voters in Wilmette" in that "hundreds of voters were effectively deprived of their right to vote" and that voters in populous districts were discriminated against, with the effect either of changing the election results or rendering the results doubtful.

In *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970), the case relied on in large part by plaintiffs and the district court here, certain nomination papers in a Chicago aldermanic election were invalidated by the Board of Election Commissioners of the City of Chicago for technical failings. Those failings had become such only because the Board had recently changed its requirements for nominating petitions as they concerned duplicated signatures and the necessity for a middle initial in the signatures affixed to the petitions. Plaintiffs, signatories and 19 would-be candidates, had compiled their petitions on the basis of the old rules, the Board having failed effectively to announce the new. The court found the Board's refusal to accept the now-invalid petitions to be constitutionally unacceptable. Due process was held to require the Commissioners to "establish and publish meaningful guidelines" for the nomination of candidates. The unannounced eleventh-hour change of policy could not be used to deprive candidates and voters the right of participating in the aldermanic election. *Compare Porter v. Bainbridge*, 405 F.Supp. 83 (D.Ind.1975).

While there is no single bright line to distinguish *Ury* and *Briscoe* from the cases cited earlier in which federal courts have declined to intervene, it is apparent that in both cases the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the elec-

tion. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, "[r]epresenting a profound attitude of fairness between man and man, and more particularly between individual and government," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 163, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), is implicated in such a situation. To be sure, Justice Frankfurter's language does not provide a litmus test for the determination of federal jurisdiction in every voting case. But for present purposes there is guidance enough in the notion that due process is implicated where the entire election process—including as part thereof the state's administrative and judicial corrective process—fails on its face to afford fundamental fairness. Further than that we need not go. In cases falling within such confines, we think a federal judge need not be timid, but may and should do what common sense and justice require.

> "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

*Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

■ The present situation, judged in light of the standards we have discussed, presented a due process violation for which relief under § 1983 was appropriate. The district court was not asked to examine the validity of individual ballots or to supervise the administrative details of a local election. It was asked to remedy a broad-gauged unfairness that infected the results of a local election. The integrity of the Tenth Ward primary in Providence was severely impugned by the undisputed events leading up to plaintiffs' suit. Almost ten percent of the qualified and voting electorate was, in effect, denied its vote in this close election because the Secretary of State, statutorily authorized manager of state elections, advertised, issued, and sanc-

tioned the use of certain ballots which the Rhode Island Supreme Court quashed after the results of the election were in. Voting by absentee and shut-in ballots had been accepted in the state over a period of about seven years; the legislature had never acted to halt the practice, and indeed, directly after the Rhode Island Supreme Court's decision, moved to reinstate it, explicitly authorizing the use of absentee and shut-in ballots in state primaries. 1977 R.I.Pub. Laws ch. 153. Prompt objection to quashing the ballots was made in federal court by the voters; and the federal court acted only after they were refused permission to intervene at the state court proceeding. The district judge could justifiably conclude that the voters, including the black voters, would be offended by the cancelling of the ballots notwithstanding their established acceptability—due process involves the appearance of fairness as well as actual fairness. And the federal court was the only practical forum for redress: there appears to have been no standard state procedure for handling a claim such as this, and the state court did not confront the questions that retroactive application of its ruling would create.

In brief, we think this to be one of the perhaps exceptional cases where a district court could properly exercise the limited supervisory role that such courts have in election cases.

### 3. The remedy

McCormick's final objection is to the district court's judgment ordering a new primary. We observe first that the decision as to the precise equitable relief to award is within the discretion of the district court. *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

> "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. Moreover, in constitution-

al adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." [Citation and footnote omitted.] *Id.* at 200, 93 S.Ct. at 1469.

The district court in its opinion surveyed the range of remedies available to it to right the constitutional wrong plaintiffs had suffered. It correctly decided that comity counselled against ordering revalidation of the ballots that the Rhode Island Supreme Court had quashed, but that circumstances would not tolerate leaving plaintiffs without a remedy. Accordingly it ordered a new primary, which had the virtue of giving the voters a further chance, in a fair election, to express their views.[14]

McCormick argues, however, that gauged by an "outcome" standard, plaintiffs failed to establish that enough of the disenfranchised absentee voters would have voted in person to have altered the result. Since Griffin's margin of victory on the total count was only 15, McCormick argues that to overcome McCormick's machine count lead of 90 votes, Griffin had to show that at least 91 of the 123 absentee and shut-in voters would have voted at the polls for him. The Rhode Island Supreme Court, in an opinion released well after the district court had acted, adopted this view, asserting that "[a]ny lesser number could not possibly have affected the outcome."

But we think the district court was not obliged as a condition to ordering a new election, to require the plaintiffs to produce 91 voters who would swear that they would have voted in person. The absentee and shut-in ballots cast in this primary obviously affected the initial election results: McCormick won on the machine count, and Griffin on the total count. Comprising about ten percent of the total vote cast, their suppression amounted to more than a de minimis irregularity. As the district court said, they were "clearly the key to the election."

14. We disagree with McCormick's argument that a new primary somehow "diluted" his supporters' vote in the earlier primary. His supporters remained free to vote as before. The Constitution protects the right of all citizens to democratic processes, not the right of any particular candidate or voters to a certain result.

█ Given the evidence of some voters—including two who were severely handicapped—that they would have voted in person, and the importance of the right to vote, the court could infer that it was more likely than not that a very significant proportion of those voting by absentee ballot would have gone to the polls had such ballots not been available. While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted, Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L.Rev. 1092, 1124–26 (1974); *Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1134–36 (1975), it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967); *Hamer v. Campbell*, 358 F.2d 215 (5th Cir. 1966), *cert. denied*, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); *Brown v. Post*, 279 F.Supp. 60 (W.D. La.1968). And when applied, different formulations of the test have been proposed: the irregularity "could have altered the outcome", *Coalition for Education in Dist. One v. Bd. of Elections*, 370 F.Supp. 42 (S.D.N.Y. 1974), *aff'd* 495 F.2d 1090 (2d Cir. 1974); the outcome "would not have been affected," *Hennings v. Grafton, supra*; an altered outcome should be "found readily where there is a serious violation and close election," *Hamer v. Ely*, 410 F.2d 152 (5th Cir.), *cert. denied*, 396 U.S. 942, 90 S.Ct. 372, 24 L.Ed.2d 243 (1969). Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted. *See Ury v. San-*tee, supra; *Toney v. White, supra; Coalition for Education v. Bd. of Elections, supra; Hamer v. Campbell, supra.*[15]

*The district court's judgment is affirmed, and the cause remanded for the scheduling of a general election to be held on the basis of the primary of July 12, 1977.*

---

15. We also agree with the district court's ruling that all indispensable parties to the suit were joined. The most significant defendants, the Secretary and the Board of Canvassers, those who issued and certified the ballots in large part, were named. The State Board might have been included, but the district court's reasoning on its status is persuasive: "The Rhode Island Board of Elections has no interest which this court can discern here. It supplied machines and certified candidates but has nothing at stake in the outcome. These functions are no bar and complete relief may be afforded without its participation." Regardless of the statutorily-assigned duties to set a date for a primary or call a special election, the district court had the power to order the relief in question. "Where it is necessary to override specific provisions of state law to afford adequate relief, the state statutes must yield." *Taylor v. Monroe County Board of Supervisors*, 421 F.2d 1038, 1041 (5th Cir. 1970).