Constance Sherbill HENRY, Ann Wilcox, Richard C. Covino, Brian Keith Charlson, Kristin M. Palace, Amy Goldsmith, Ellen Citron, and Amy Perry, Plaintiffs,

v.

Michael J. CONNOLLY, as he is the Secretary of State of the Commonwealth of Massachusetts, Defendant,

and

Loretta A. Capezzuto and Massachusetts Committee for Responsible Waste Management, Intervenor–Defendants.

Civ. A. No. 90–11767–K.

United States District Court,
D. Massachusetts.

July 24, 1990.

Kenneth Luke Kimmell, Charles C. Caldart, Public Interest Litigation Project, Boston, Mass., for plaintiffs.

James Shannon, Eric J. Mogilnicki, Asst. Atty. Gen., Boston, Mass., for defendant.

Ferriter, Scobbo, Sikora, Caruso, Rodophele, Robert Rodophgle, Boston, Mass., for intervenor-defendants.

## OPINION

KEETON, District Judge.

In *Capezzuto v. State Ballot Law Commission*, 407 Mass. 949, 556 N.E.2d 366 (1990) (hereinafter the "SJC Opinion"), the Supreme Judicial Court ("SJC") unanimously held that

> the full text of the initiative petition in question [Initiative Petition 89–39 ("An Act to Promote Environmentally Acceptable Product Packaging," hereinafter "the Recycling Initiative")] was not subscribed to by ten qualified voters as required by [Mass. Const., Amend.] art. 48, The Initiative, II, §§ 1 and 3, and consequently, the petition should not have been certified by the Attorney General or filed with the Secretary of the Commonwealth.

*Id.* at 957, 556 N.E.2d 366. *See also* SJC's Order (reproduced at Plaintiffs' Appendix of Exhibits, exhibit A, page 1 (Docket No. 4, filed July 17, 1990)) (same text). The Secretary of State has indicated that he will comply with the order of the SJC and will not include the Recycling Initiative on the November 1990 Massachusetts Ballot. Plaintiffs, complaining that this decision violates their rights under the First and Fourteenth Amendments of the United States Constitution, seek an order compelling the Secretary to place the Recycling Initiative on the November 1990 ballot, an order permanently enjoining the Secretary from applying the SJC's Opinion to future initiative campaigns, and attorney's fees.

The parties report that time is of the essence. The Secretary seeks final disposition of this case, including any appellate review, by August 9, 1990, in order to allow sufficient time to prepare and publish the Massachusetts Voter Pamphlet. To expedite final disposition of plaintiffs' claims in the district court, the parties agreed at a hearing on July 18, 1990, the day after this action was filed, to forego a ruling on the Application for Temporary Restraining Order and Motion for Preliminary Injunction (Docket No. 2, filed July 17, 1990) and instead to proceed immediately to trial. Accordingly, the court called this case for trial on July 20, 1990.

Pursuant to the Agreed Statement as to Exhibits and Facts (Docket No. 18, filed July 20, 1990), the parties jointly filed as evidence in this case parts of the record of the case argued before the State Ballot Law Commission ("BLC" or "Commission") and the SJC, numerous affidavits, and assorted other materials. Trial Exhibit 1 (except for tabs 6, 7 and 8, which were offered separately as Trial Exhibit 3, *see infra*). Plaintiff has also filed a Supplemental Affidavit of Amy Perry to which defendant-intervenors object, but defendant does not. Trial Exhibit 2. Finally, defendant-intervenors have filed three additional documents as Trial Exhibit 3—a copy of a *Boston Globe* advertisement, a sample Initiative Petition, and a copy of House Bill 4456, which is pending before the Massachusetts House of Representatives—to which plaintiff conditionally objects unless the court receives the Perry Supplemental Affidavit offered as Trial Exhibit 2. I took these objections under advisement along with the case. No other evidence was proffered by any party.

In this Opinion, I set forth undisputed facts and conclusions of law central to deciding this controversy. Fed.R.Civ.P. 52(a).

For the reasons explained in this Opinion, I conclude that judgment must enter for the defendant and intervenor-defendants.

## I. Procedural History

The legislative power of the Commonwealth of Massachusetts is typically vested in the General Court. Mass. Const., Pt. 2, Ch. I. Article 48 of the Amendments to the Massachusetts Constitution (hereinafter "Article 48"), however, reserves to the people the power to approve a "popular initiative, which is the power of a specified number of voters to submit ... laws to the people for approval or rejection." *Id.*, Amend. Art. 48, Pt. I, Def. That article of amendment, as amended, also governs the procedure for placing an initiative on the ballot:

> Section I. Contents.—An initiative petition shall set forth the full text of the ... law, hereinafter designated as the measure, which is proposed by the petition....
>
> Section 3. Mode of Originating.— *Such petition shall first be signed by ten qualified voters of the commonwealth* and shall be submitted to the attorney-general not later than the first Wednesday of the August before the assembling of the general court into which it is to be introduced, and if he shall certify that the measure ... [is] in proper form for submission to the people ..., it may then be filed with the secretary of the commonwealth. The secretary of the commonwealth shall provide blanks for the use of subsequent signers, and shall print at the top of each blank a fair, concise summary, as determined by the attorney-general, of the proposed measure....

*Id.*, Amend. Art. 48, Init., Pt. II, §§ 1, 3 (as amended by *id.*, Amend. Art. 74, § 1) (emphasis added). If a certain number of voters thereafter sign the petition blanks provided by the Secretary—in this case, 50,525 voters in the first round and an additional 8,421 voters in the second round—"then the secretary of the commonwealth shall submit such proposed law to the people at the next state election." *Id.*, Amend. Art. 48, Init., Pt. V, § 1 (as amended by *id.*, Amend. Art. 81, § 2).

The Recycling Initiative was purportedly signed by nineteen Massachusetts voters and was filed with the Attorney General on August 2, 1989. The Attorney General thereafter certified that the petition was in proper form for submission to the people and filed the petition with the Secretary. Intervenor Capezzuto, disagreeing with the Attorney General's determination, filed an objection with the BLC asserting, *inter alia*, that the petition had not been signed by ten qualified voters of the Commonwealth. After a hearing, the Commission overruled the objection based on its determination that the petition had been properly signed by twelve qualified voters. Because the Commission held that twelve qualified voters had signed the petition, the Commission "decline[d] to find facts regarding the other seven signers." *Capezzuto v. Perry*, State Ballot Law Commission Docket No. 89–1, slip op. at 10–13, 11 n. 1 (October 12, 1989) (hereinafter "BLC Opinion," reproduced at exhibit B to Appendix of Exhibits, Docket No. 4).

On October 17, 1989, Capezzuto appealed the Commission's ruling to the Superior Court. That appeal was transferred to the SJC in April 1990, consolidated with another case, and argued to the Justices on May 10, 1990. On July 11th, the SJC ruled that three of the twelve signers—plaintiffs Goldsmith and Citron, and Armando Carbonell—had not "subscribed to" (the phrase appearing in the SJC's Opinion, 407 Mass. at 957, 556 N.E.2d 366, and Order) or "signed" (the term used in Article 48, The Initiative, Part II, Section III, and at various points in the SJC Opinion) the "full text" of "[s]uch petition" as required by Article 48. The validity of the other seven signatures was not before the court, but it is clear from the undisputed facts, as explained below, that these seven signatures were even more vulnerable to attack than those of Citron and Goldsmith. The SJC concluded that the initiative could not be placed on the November 1990 ballot.

## II. Factual Predicate

The SJC reviewed deferentially the facts as found by the Commission (although, of course, conclusions of law, including mixed fact-law determinations, were reviewed *de novo*) and found that the evidence supported the Commission's factual findings. SJC Opinion, 407 Mass. at 952, 556 N.E.2d 366. *See generally* BLC Opinion, slip op. at 4–9; SJC Opinion, 407 Mass. at 952–54, 556 N.E.2d 366; Agreed Statement of Facts, Trial Exhibit 1, Tab 1, pp. 650–64. The parties do not dispute these findings, which I adopt as the findings of this court.

Plaintiff Perry, the principal drafter of the petition, produced a first draft of the petition on July 28, 1989. She sent that draft, along with a cover letter inviting comments, to eighteen other people, including plaintiffs Goldsmith and Citron.

On August 1, 1989, Perry sent a signature page to each of these eighteen people. Nine of the twelve whose signatures were validated by the Commission—including plaintiffs Perry, Citron, and Goldsmith—signed the signature page on August 1st after receiving the first draft of the petition. The other three—Alexander, Pines, and Carbonell—signed the signature page sometime on August 2nd, the filing deadline date for initiatives for the 1990 ballot.

In response to comments that Perry received, she prepared a second draft on August 2, 1989. This draft was "substantially different from the July 28 draft." BLC Opinion, slip op. at 5. Perry faxed copies of this second draft to eight other signers, but not to Goldsmith or Citron. Thus, only nine persons, including Perry, actually received a copy of the second draft.

Later on August 2nd, Perry orally described to Goldsmith and Citron the substantive changes that had been incorporated into the second draft. Perry offered to read those changes verbatim to Goldsmith, but Goldsmith declined, stating that she was accepting the changes as described to her by Perry. Citron, too, stated that she understood the changes, and that she felt comfortable with them. Although Perry did not personally describe the changes to the third signer whose signature was invalidated by the SJC—Carbonell—she did orally describe the changes to Carbonell's associate, Patricia Daley, who described them to Carbonell and then reported back to Perry that Carbonell accepted the changes.

Carbonell is not a party to this action, but that fact alone may not preclude plaintiffs from arguing that their constitutional rights were violated when the court disregarded his signature. However, because Carbonell learned of the changes in the second draft, and communicated his acceptance, through an intermediary, the claim that his signature was effective is more tenuous than the claims that the signatures of Goldsmith and Citron were effective. Thus, if plaintiffs cannot show that the court's disregarding the signatures of Citron and Goldsmith was a violation of plaintiffs' federal constitutional rights, for even stronger reasons they would be unable to show that the court's disregarding Carbonell's signature was such a violation. Also, although the other seven signatures are not before this court, I note that a claim that those seven signatures were valid would also be more tenuous than the claim that the signatures of Goldsmith and Citron were valid. Four of the seven never saw the second draft but had the expected changes explained to them (in varying degrees of thoroughness) on August 1st before Perry prepared the second draft; the other three neither saw the second draft nor were told about the substance of its changes. *See* Agreed Statement of Facts, Trial Exhibit 1, Tab 1, pp. 653–55.

Later still on August 2nd, Perry produced a third draft of the petition that was "almost identical" to the second draft "except for some minor typographical and grammatical corrections." BLC Opinion, slip op. at 8. No one except for Perry saw the third draft, nor did Perry discuss these changes with any of the signers.

Perry caused to be submitted to the Attorney General this third draft, with attached pages containing the nineteen signatures. Thereafter, in compliance with Article 48, The Initiative, Part V, proponents of the petition gathered over 117,000 signa-

tures on the petition blanks provided by the Secretary.

In summary, I find, as did the SJC, that only nine signers had "before them"—that is, had physical custody of—a copy of the second draft of the petition at some time before the petition was filed.

## III. Preliminary Matters

### A. Scope of Review

■ This court does not sit in appellate review of the decision of the SJC. Nor is this court empowered to decide any issues of *state* law in a way contrary to the SJC's conclusions of state law.

This court does, however, sit as a court of original jurisdiction to hear complaints of violations of federal law, including federal constitutional law.

Thus, the plaintiffs in this case do not—and, indeed, may not—seek a review of the SJC's state-law determinations. Rather, they seek a declaration that the SJC's state-law holdings and order, with which the Secretary has indicated he will comply, result in a violation of plaintiffs' federal constitutional rights. Stated another way, plaintiffs seek a declaration that Amendment Article 48 of the Massachusetts Constitution, as interpreted by the SJC, violates rights protected by the Federal Constitution, or at the very least, that defendant is estopped from applying the SJC's Order to plaintiffs in this case.

### B. Standing and Jurisdictional Challenges

■ Intervenor-defendants, urging the court not to reach the issues of federal constitutional law, have raised res judicata, jurisdictional, and standing issues that, they assert, bar each of these plaintiffs from any recovery in this court. Defendant has joined in some but not all of these threshold challenges.

Ordinarily, a court should and does address jurisdictional issues first. In cases where it is very clear that in any event the claims asserted cannot be sustained on the merits, however, and where the jurisdictional issues are complex, it is sometimes appropriate to move directly to the merits

rather than addressing more complex issues bearing on whether some parties lack standing or the court lacks jurisdiction. *See Student Government Association v. Board of Trustees*, 868 F.2d 473, 475 (1st Cir.1989) (because court concluded that complaint did not state a First Amendment violation, court did not consider defendants' argument that plaintiffs lacked standing); *Latinos Unidos De Chelsea En Accion (Lucha) v. Secretary of H.U.D.*, 799 F.2d 774, 790 (1st Cir.1986) (court "f[ou]nd it unnecessary to decide whether plaintiffs technically have standing" because "[e]ven if they do, they have failed to establish a prima facie case"); *Berrigan v. Greyhound Lines, Inc.*, 782 F.2d 295, 296–97 n. 1 (1st Cir.1986). This procedure is especially appropriate where expedited adjudication is necessary and where core fundamental rights have allegedly been violated. *See Meyer v. Grant*, 486 U.S. 414, 421–22, 108 S.Ct. 1886, 1891–92, 100 L.Ed.2d 425 (1988) ("the circulation of a petition [to place a proposed law on the ballot] involves the type of interactive communication concerning political changes that is appropriately described as 'core political speech'").

I conclude that this case presents such a circumstance. Accordingly, I shall forego determination of these standing and jurisdictional issues and instead proceed directly to adjudicate the merits, which are less complex and to which the correct answers under applicable law are less open to debate. Should a higher court take a different view on the merits, of course, the jurisdictional issues will be fully preserved in the record for consideration by that court or as it may direct on remand.

### IV. The Federal Constitutional Claims

### A. First Amendment Claims

In their complaint plaintiffs (some of whom were intervenor-defendants before the SJC) characterize the SJC ruling as a requirement that "all ten original signers ... *read* the full text of the Initiative Petition." Complaint ¶ 1 (Docket No. 1, filed July 17, 1990) (emphasis added). They underscore this characterization by repeated references to the ruling as a "reading re-

quirement." *Id.*, ¶¶ 2, 25, 27, 28, 29, 30, 33, 34, 36, 37, 38, 40, 42, 43, 46, 48, 49, 51, Prayers 1, 5. *Cf. id.* ¶ 19 (quoting a passage in the SJC Opinion, 407 Mass. at 955, 556 N.E.2d 366, saying signers did not "actually see the applicable text"); ¶ 20 (characterizing the SJC ruling as a requirement that a signer "must read or visually review"); ¶¶ 52 and 53 ("this [reading] requirement"); ¶ 55 ("requirement that a signer read the text").

Plaintiffs' written memoranda in this court likewise characterize the SJC's ruling as a "reading requirement." *E.g.*, Plaintiff's Memorandum in Support of Application for Temporary Restraining Order/Motion for Preliminary Injunction at 7 (Docket No. 3, filed July 17, 1990) (containing over 40 allusions to "reading requirement" or requirement of "read[ing]"); Plaintiffs' Supplemental Brief at 2, 3, 5 (Docket No. 14, filed July 20, 1990). I conclude that this is not a correct characterization of either the SJC's order or its opinion. Indeed, plaintiffs' counsel in oral argument before this court, if not conceding the error of this characterization, at least changed the emphasis of their argument, acknowledging that the SJC Opinion nowhere uses the term "read."

■ Although repeated mischaracterization of the ruling under attack is a kind of advocacy that does more to obstruct than to aid the court's efforts to reach a reasoned decision consistent with the facts and the applicable law, such overstatement does not relieve the court of its obligation of reasoned decision, candidly explained. Thus, rather than rejecting plaintiffs' claims because they address false issues that are not presented on the record in this case, I proceed first to try to recast their contentions in more compelling form, free of the vulnerability that is inherent in overstatement.

■ In the present case, two significant matters of undisputed historical fact may be restated as follows:

(1) None of the signers signed on a page that was, at the moment of signing, physically attached to the full text of the petition as submitted (that is, the third draft), and no more than two (Alexander and Pines), and perhaps only one or none, of the signers signed on a page that was, at the moment of signing, physically attached to the full text of the second draft of the petition.

(2) At most, nine of the signers, either at the time of signing or at any time before the petition was filed, had physical custody of [or had "before them," SJC Opinion, 407 Mass. at 954, 556 N.E.2d 366] a copy of the full text of the second draft of the petition.

The SJC assumed (favorably to the parties who are plaintiffs before this court and were intervenors before the SJC), without deciding, that this second draft was identical in all material respects with the final draft of the petition, and "that it is permissible to make typographical and grammatical changes in the text of the petition that do not alter its substance." 407 Mass. at 954 & n. 6, 556 N.E.2d 366. The SJC also assumed, without deciding, that it is permissible to sign a detached piece of paper rather than a page attached to the petition itself, and that signatures could be gathered in advance of the preparation of the final, precise text of the proposed law and orally reaffirmed upon receipt of the final text.

The SJC did not need to reach those questions because it concluded that Article 48 requires at least that all signers have physical custody of the petition at some time before a petition is filed.

Given this narrow holding by the SJC, the First Amendment issue properly before this court is similarly narrow: Is this requirement of physical custody (a description far more accurate than plaintiffs' "reading requirement" terminology) so onerous as to unduly and unconstitutionally burden plaintiffs' First Amendment rights (as incorporated through the Fourteenth Amendment)?

The argument that this is the precise issue and that it should be answered affirmatively is less vulnerable than the argument as framed by plaintiffs, but I

nevertheless conclude that this question must be answered in the negative.

The process of placing initiative petitions on the ballot in Massachusetts may, for present purposes, be viewed as encompassing two stages. First, before an initiative petition is filed, a mere ten voters must have "before them," in physical custody, the "full text" of the petition—that is, the *"precise terms* of a proposed measure," *Opinion of the Justices,* 309 Mass. 555, 560, 34 N.E.2d 431, 433 (1941) (emphasis added)—and must "sign[ ]" "[s]uch petition." Second, a number of voters equal to three-and-a-half percent of the entire vote cast for governor in the previous election— in this case, approximately 59,000 voters, Trial Exhibit 1, Tab 17, p. 2—must sign a petition with a concise summary of the proposed law.

Whether a proposed law has sufficient popular support to be placed on the ballot is, quite obviously, measured in the second of these two phases. Yet these tens of thousands of voters, when signing the petition, see only a brief summary of the proposed law. It is only the first ten who "see" the "full text"—the "precise terms" —of the proposed measure—a text that, in this case, ran nine full, highly detailed pages.

To insure that the "full text" of the proposed law is carefully drafted and reviewed by at least some voters, a state could, and Massachusetts could through Article 48, require those voters to sign the full text in a formalized manner. That is, like rules in the law of conveyancing, of wills, and of the statutes of frauds—all of which impose some formalities upon solemn verbal acts in the hope of forcing the signer to consider carefully his or her actions—it is consistent with the broad scheme of placing initiative petitions on the ballot, without undermining the initiative process through overuse, to read Article 48 as imposing the requirement that the act of "sign[ing]" "[s]uch petition" be solemn and formal. Certainly, neither the First Amendment nor any other federal constitutional principle precludes a state from adopting a procedure that requires the

signing of an initiative petition to be expressed in a formal way quite like the requirements for deeds and wills and contracts of a type regulated by a statute of frauds.

Moreover, the SJC did not even go that far. That is, the SJC did not hold that the signing by the initial ten voters had to meet the stringent requirements of, for example, signing deeds, but only that, at some time before a petition is filed, a signer must have "before" him or her, or must "see," the petition, or have the opportunity for "firsthand review." This requirement is not onerous, does not criminalize any actions associated with the initiative petition process, and does not erect a broad prophylactic rule burdening free expression. Plaintiffs' cited authority is thus distinguishable. *Meyer,* 486 U.S. at 420–25, 108 S.Ct. at 1891–94 (statute that makes it a felony to pay petition circulators is unconstitutional); *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) (statute creating broad prophylactic rule making it a crime and a cause for disbarment for members and attorneys of the NAACP to associate for purposes of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights violates the First and Fourteenth Amendments). Accordingly, Article 48 does not involve "a limitation on political expression subject to exacting scrutiny," *Meyer,* 486 U.S. at 420, 108 S.Ct. at 1891, nor need the Commonwealth support Article 48 with a showing of "a compelling state interest," *Button,* 371 U.S. at 438, 83 S.Ct. at 341.

Thus, plaintiffs broad First Amendment challenge is plainly without merit.

## B. *Fourteenth Amendment Due Process Claims*

■ The argument for plaintiffs in restated form also states, in a stronger way than does the argument as framed by plaintiffs, a claim for relief under the Due Process Clause. The thrust of this argument is that, at the very least, this "physical custody" requirement ought be imposed prospectively, or that defendant is estopped

from requiring plaintiffs in this case to comply with this requirement, because retroactive imposition of this "technical" requirement, without notice, violates plaintiffs' due process rights. The argument cannot, however, withstand close examination.

The SJC could have, consistently with rules of statutory and constitutional interpretation, interpreted Article 48 quite literally. One could cogently argue that the requirement that "an initiative petition shall set forth the full text of the ... law ... which is proposed by the petition ... [and] shall first [before being "submitted to the attorney-general"] be signed by ten qualified voters," literally interpreted, means that the *petition* must be signed, and not that a detached signature page may be signed and later attached to the petition. Such an interpretation, subject, of course, to provisions regarding fair notice, would not offend the First Amendment.

Had the SJC adopted such an interpretation, it might have raised serious federal constitutional issues. That is, such an interpretation, one might argue, could have been viewed as overturning (and one might argue, in a sense, "retroactively"), a longstanding practice of both the Attorney General and the Secretary—two executive officials charged with responsibility for overseeing the initiative process—that allowed a voter to sign a detached signature page, and thereafter attach it to a petition. *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir.1970) (failure to give notice that established custom and practice would be changed and that standards to be applied to voter petitions would now be vigorously enforced, where statutory standards were ambiguous, violated due process); *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978) (decision of Rhode Island Supreme Court invalidating absentee and shut-in ballots in primary election, which ballots comprised about ten percent of the entire vote cast, violated voters' due process right to notice when state had seven-year practice of advertising the availability of absentee and shut-in ballots for primary elections, providing the absentee and shut-in ballot forms, and counting such ballots in the election results).

I need not reach these issues, though, because the SJC did not so hold. That is, the SJC did not invalidate the Recycling Initiative because the signature pages, when signed, were not physically attached to the petition, but rather, because on the undisputed facts it cannot be determined that each of at least ten signers had physical custody of the full text of the petition at some time before the petition was filed.

Plaintiffs argue that even if the SJC's holding is read in this way, rather than as a "reading requirement," the practical impact on rights secured by the First and Fourteenth Amendments is the same because plaintiffs reasonably believed no such "technical" interpretation had ever been part of the law of Massachusetts in the past, and because plaintiffs reasonably relied upon the expectation that no change in the law to such an effect as this would be made except prospectively, with fair notice.

Although this last formulation of the argument is not so clearly flawed as plaintiffs' effort to have this court read the SJC opinion as imposing a "reading requirement," I conclude that it, too, must be rejected. In the first place, the SJC's invoking some form of solemn act requirement was in no sense unpredictable or surprising. Indeed, the parties who rely upon enforcement of the state constitutional limitations on the scope of the exercise of legislative power through initiative petitions would have experienced greater surprise, and for good reason, had the SJC concluded that the formalities prescribed in Article 48 are merely technical and precatory.

Second, even though the record discloses a longstanding practice inconsistent with a legal rule that Restated Finding No. (1), *supra* at 927, is decisive against plaintiffs' claims, the record shows no supportable basis for determining (either as a matter of fact or as a matter of law) that there was in existence an executive interpretation and practice or pattern that was inconsistent

with the SJC holding that Restated Fact No. (2) is decisive. In this circumstance, plaintiffs cannot properly rely on silence, and on an absence of definitive interpretation of the legal rule, as an invitation to speculate on the proper interpretation of Article 48 and then to rely on that speculation.

I thus conclude that, as a matter of law, plaintiffs have failed to demonstrate that their federal constitutional rights have been violated by the kind of retroactive change of longstanding practice affecting core First Amendment rights that were involved in *Briscoe* and *Griffin*. Moreover, as a matter of fact, the Supplemental Affidavit of Perry (Trial Exhibit 2) fails to support a finding of any governmental action that could give rise to an entitlement to estoppel.

First, Perry's Supplemental Affidavit was not before the factfinding commission, and this court's role is not that of *de novo* factfinder. If this position is correct, I should either sustain the objection to Trial Exhibit 2, or at least receive it as against the intervenor-defendants only for a limited purpose other than supporting a *de novo* factfinding.

Second, even if it is assumed that this court has such factfinding authority on this issue, I find that the more compelling evidence of the Secretary's practice is the Secretary's written explanation of the initiative process in various documents, *see, e.g.,* Trial Exhibit 1, Tab 17 (also attached as an exhibit to Perry's Supplemental Affidavit), not the affiant's state of mind as to her interpretation of these documentary expressions and of the oral statements made to her by David Sullivan, the Secretary's legal counsel. I do not find the Secretary's communications to be subject to being reasonably interpreted as the affiant has interpreted them. Her interpretation and her reliance upon it are not justifiable, of course, unless the objective test of reasonableness in the circumstances is satisfied. Because I find against plaintiffs even when taking Trial Exhibit 2 into account, I conclude that the intervenor-defendants' objection to Trial Exhibit 2 is moot. Also, I need not consider plaintiff's conditional objection to Trial Exhibit 3 because my findings and conclusions are the same, whether or not I consider Trial Exhibit 3 as part of the record before me.

An additional and fundamental problem with the plaintiffs' contention is that each of the arguments they present for legal recognition of the kind of reliance interest they have asserted proves too much. That is, plaintiffs' emphatic insistence that the initiative process is designed to let voters decide whether controversial legislation will be adopted, and that the initiative petition should go to the people because it has been signed by over 117,000 voters, would wipe out, element by element, each effort by the Commonwealth, and each possible interpretation by the SJC, that gave practical force to any test for "signing" a petition containing full text. All that might remain would be a possible exception for a highly fact-based test or tests depending on state-of-mind facts with respect to the signers' intent—what they recalled and understood of what they had been told about the content of the proposed law—and whether some fraud had been practiced upon them by the proponent of the initiative.

■■■ A state is not compelled by the First or Fourteenth Amendments of the Constitution of the United States to adopt such state-of-mind tests for the declaration of one's support for an initiative petition proposing controversial legislation. Any argument that a state is forbidden to adopt and rigorously enforce bright-line, "formal" rules of legally effective "signing" runs counter to a long legal tradition, noted above, of "solemn act" formalities, exemplified by those for conveying property, making wills, and entering into long-term contractual obligations. A state may choose some set of formalities to hold within reasonable bounds the number of initiative petitions so that the electorate has a reasonable opportunity to understand them, debate them, and reach informed judgments about them.

The rights of political expression that the government must respect include, of course, not merely those of one view on

each political issue but instead the rights of all those of differing views who have an interest in the political controversy. One of the vulnerable points of plaintiffs' arguments in this case is that they eloquently describe the "First Amendment rights" of those who wish to promote initiative petitions, but acknowledge no weight for the equal rights of those—including both parties and non-parties—who may think their political interests are best served by enforcement of constitutionally declared "solemn act" requirements for placing initiative petitions on the ballot. That intervenor-defendants may oppose this initiative petition on unstated substantive grounds, in addition to the procedural grounds at issue in this litigation, is totally irrelevant to this court's determination of the federal constitutional law issues presented.

■ Plaintiffs make one last due process argument. Plaintiffs characterize the Massachusetts constitutional provisions regarding required formalities for an initiative petition as vague and ambiguous; on this premise, they invoke analogies, for example, to rules of law that protect defendants in criminal prosecutions against charges based on vague statutes. The analogy is deeply flawed not only in the premise that the state constitutional provisions at issue here are vague but as well because of failure to observe that our legal system has for good reason gone to exceptional lengths in protecting an individual charged with crime from abuse of the awesome power of the state. Here, in contrast, the state must be sensitive not only to the interests in freedom of expression and association, and the voting rights, of those who propose to exercise the state's legislative power through an initiative petition, but as well to the equal right of their political adversaries that the state itself remain neutral between them. Thus, the state may develop and maintain reasonable, content-neutral regulations to protect the integrity of the process to the benefit, in the long run, of all participants in the public consideration of controversial proposals for legislation.

## C. Fourteenth Amendment Equal Protection Claims

One consequence of properly characterizing the SJC's holding as imposing a "physical custody" requirement rather than a "reading requirement" is that it exposes the weakness in one of plaintiffs' most rhetorically appealing arguments.

Plaintiffs' argument that the Equal Protection rights of blind, dyslexic, illiterate, and non-English-speaking persons are impaired by the SJC's ruling rests on the flawed premise that the SJC's opinion and order are reasonably subject to the interpretation that one must "read" or at least "see," in the literal sense, the full text of the petition in order to "sign." That issue was not before the SJC, however, and this court should not assume, for example, that the SJC would deny a blind person the right to "sign" because of inability to "see." It is true that the SJC opinion refers at one point to its ruling as one requiring "at a minimum, that each signer actually *see* the applicable text," SJC Opinion, 407 Mass. at 955, 556 N.E.2d 366 (emphasis added). *See also id.* ("actually saw," "actually see," "seen," "actually examined"), *id.* at 956, 556 N.E.2d 366 ("first-hand review," "see"). Earlier in the opinion, however, the SJC speaks of "people who *had before* them the entire text...." *Id.* at 954, 556 N.E.2d 366 (emphasis added). Moreover, even if we take the SJC opinion as establishing a requirement that the signer "see" the full text, it would be most reasonable to expect that the SJC, if confronted with the precise issue, would rule that the "see[ing]" requirement can be satisfied in some other reasonable way if a person lacks the ability to "see."

As a matter of common sense, plaintiffs' proposed interpretation of the SJC opinion as invidiously classifying and discriminating against *inter alia* blind, dyslexic, and illiterate persons, is not a reasonable interpretation of that opinion. Plaintiffs' remedy, if they truly seek a clarification of state law in this respect, is to seek it in the state courts rather than to ask that this court accept, as a premise for ruling on federal

constitutional issues, the plaintiffs' extraordinary extrapolation from the SJC opinion.

## D. Public Policy Issues

Plaintiffs argue that neither the "reading requirement," as they interpret the SJC Opinion, nor even the "physical custody" requirement as I interpret that Opinion, fits the public policy rationale of the SJC opinion. To reach this conclusion, though, plaintiffs imply that the *only* public policy interest on which the SJC ruling is founded is protection against fraud upon signers. This is plainly a flawed assumption. After discussing "the potential for fraud inherent in the practices which occurred here," SJC Opinion, 407 Mass. at 956, 556 N.E.2d 366, the SJC added: "The ten-signature requirement is far from onerous, and is supported by sound public policy reasons." *Id.* This passage cannot reasonably be interpreted as saying that the *only* public policy reasons underlying the requirements of Article 48 are concerned with the potential for fraud. Just before commencing its discussion of the potential for fraud, the court stated: "A signature requirement would be meaningless if the person supplying the signature has not first seen what it is that he or she is signing." *Id.* at 955, 556 N.E.2d 366. The potential for fraud is then introduced as a "[f]urther" point. *Id.* Moreover, such a reading as plaintiffs propose would disregard the established legal tradition of solemn act requirements in many and varied legal contexts, which is founded on public policy reasons underlying the state constitutional provision itself as well as the SJC's interpretation of it. Indeed, Plaintiffs' Memorandum in Support of Application for Temporary Restraining Order/Motion for Preliminary Injunction, their principal brief before this court, acknowledges that:

> As the [SJC's] discussion demonstrates, the policies behind this requirement [of ten signers] are, first, to ensure that a signature is "meaningful," i.e., that the signer was sufficiently informed about the petition to have meaningfully assented to it and, second, to deter signature gatherers from misrepresenting the contents of a petition to potential signers.

*Id.* at 17. Moreover, when policy reasons are obvious, a court is not to be understood as acting without regard for them simply because it does not elaborate the obvious.

In any event, even if the Commonwealth were concerned with fraud, the Commonwealth would not be required to conduct an inquiry into the state-of-mind of all signers to initiative petitions. The constitution could reasonably provide, and the SJC could reasonably enforce, a bright-line rule designed to simplify the rules and avoid needless, complex litigation.

## E. Scope of Requested Relief

■ A final perspective on plaintiffs' arguments is that, even when stripped of overstatement to render them somewhat more appealing, they do not fit the relief plaintiffs seek. If accepted without qualification, they prove too much—in effect, denying the power of a state to enforce reasonable "solemn act" requirements for placement of initiative petitions on the ballot. Their arguments suggest no limiting principle, and I have not been able to identify one, by which a court could appropriately strike down the SJC ruling in this case without supporting a drastic federal constitutional intrusion into state authority to maintain its own chosen form of reasonable regulations of the initiative process. Federal constitutional doctrines regarding "least restrictive means"—*see, e.g., Button*, 371 U.S. at 438, 83 S.Ct. at 340 (broad prophylactic rules suspect); *Dunn v. Blumstein*, 405 U.S. 330, 335, 92 S.Ct. 995–999, 31 L.Ed.2d 274 (1972) (restriction must be necessary to advance compelling state interest); *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939)—do not mean that federal courts are to intrude so deeply upon the legislative and judicial choices of a state as would be required to hold that solemn act requirements reasonably supportable on public policy grounds are forbidden because less restrictive means were available—such as state-of-mind requirements designed to ferret out fraud. Indeed, even plaintiffs' proffered authority recognizes the drastic and staggering na-

ture of a federal court's intrusion into a local election. *Griffin*, 570 F.2d at 1076, 1079 (concluding nevertheless that this case was "one of the perhaps exceptional cases where a district court could properly exercise the limited supervisory role that such courts have in election cases"). *Griffin*, though, presented an egregious due process violation quite unlike the claims at bar, and is thus distinguishable. In the context of this case, then, the less restrictive means are simply not aimed at accomplishing, and would not accomplish, the broader public policy objectives of the legal rule.

### VI. Conclusion

For the foregoing reasons, final judgment shall be entered for defendant and intervenor-defendants.